**UNITED STATES of America**

v.

**HARTE–HANKS NEWSPAPERS, INC.,**
et al.

**Crim. No. 15393.**

United States District Court
N. D. Texas,
Dallas Division.

Jan. 19, 1959.

See also 154 F.Supp. 68.

Victor R. Hansen, Asst. Atty. Gen., Chas. L. Whittinghill, Dept. of Justice, Washington, D. C., W. B. West, III, U. S. Atty., Fort Worth, Tex., Henry M. Stuckey, Kenneth N. Hart, Larry L. Williams, Dept. of Justice, Washington, D. C., for the Government.

Dan Moody, Austin, Tex., T. J. McMahon, McMahon, Smart, Sprain & Wilson, Abilene, Tex., William L. McGovern, Arnold, Fortas & Porter, Washington, D. C., Edward L. Peteet, Marshall, Tex., James O. Juntilla, Washington, D. C., for defendants.

DAVIDSON, Chief Judge.

We have before us a contest between two newspapers. According to one view it may have been for domination of the other and of the area. According to another view it may have been a fight for existence.

We bear in mind that this is not a civil suit of course between the two papers. One of the papers bowed out of the contest accepting a price of $300,000. There was the severest competition between these two papers for a term of years. Much of the evidence discloses the zeal and earnestness of the contestants in this competition with each other.

The Government brings this prosecution based on the charge that the prevailing paper in the contest violated the anti-trust law and thereby destroyed competition between the advertising public and the surviving paper.

The advertising public, however, after the contest, according to the evidence, paid some 25¢ per inch less for their advertising than they did before. This came about by having to advertise only in one paper, whereas before they had advertised in two.

It is insisted that Greenville, a town of only 17,000 could not profitably support two daily papers and that this was apparent to the owners who for several years prior to the merger made proposals and counter proposals to buy out each other.

During this fight between the papers which we might call a fight for survival they each lost over $100,000. The Banner sold out to the defendants in this case, some of whom constitute a group or chain of Texas newspapers. Thus the Banner became the property of a financially strong concern and put in more money into its plant and more solicitors in the field and was gaining ground in

point of circulation in the Greenville area.

At this stage the Herald agreed to sell and did receive $300,000 for its plant.

Our attention is called to the fact that the day of the old hand press with a few sheets of local news when a paper could be operated on a plant of little cost has gone by and that the public is demanding daily papers with ample advertising space and adequate news columns. The machinery to produce papers of this type has become more expensive so that the small papers have disappeared. Where formerly almost every town had two or more local papers this no longer now exists. In fact, the evidence shows that Fort Worth, a city of more than 300,000 people, is the smallest city in Texas to have two daily papers and that Greenville was the last of the smaller towns in which the two papers survived.

It is insisted by the Government that the Banner with its financial backing sought to curtail the credit of the Herald. Mention of the financial status of the papers had taken place in correspondence. One of the letters offered in evidence was from a Fort Worth bank to a Greenville banker advising them that they were acquainted with the Harte-Hanks organization that had bought the Greenville Banner and that they were very reliable people and worthy of credit. In the inter-office correspondence among the defendants appear communications and letters in which they discuss the effect of the financial strain which the Herald would be undergoing. These comments were no more than an expression of the natural outcome of a fight between two papers wherein one of them had received large financial support by reason of its new owners and that both papers had been losing money would in all probability put the Herald in bad financial straits. We think this correspondence simply calls attention to that condition and are not prepared to say that it together with all the other evidence contained in the Government's case in the light of the stipulations made between the parties was a planned design to destroy competition to the detriment of the advertising public.

The evidence shows that newspaper advertising is now considered a necessity to the successful operation of public enterprises. So completely apparent has this become true that their need is regarded as a quasi public service. This service may be performed by one paper or several. The trend of events and commercial activity has seemingly limited it to one paper in most cities. Moreover, competition between rival enterprises doesn't create a condition necessarily desirable for the production of either the convenience or economic advantage of the public, as an example of which might be cited the numerous small telephone systems which in the memory of some of you existed in different small communities and even in small cities. They not only became an added expense but the owner never knew which phone to use and part of his customers might be subscribers to one system and another part to the other. In this case it was a great relief to the public to see one of the concerns buy the other one out and take one of the unnecessary phones off of their tables. It is the contention of the defendants in the case that what was true of the dual telephone system has in a measure become true in the newspaper operation.

Our higher courts have held that even though there is a consolidation of papers in the larger cities that a violation of the antitrust law does not necessarily follow. Only recently the New Orleans Picayune, a large paper in a large city, acquired its rival the New Orleans Item. They each had a large circulation. The Department of Justice cleared this acquisition although it had previously challenged an earlier acquisition by Times-Picayune in Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 877, 97 L.Ed. 1277, in which the Supreme Court said:

"The daily newspaper, though essential to the effective functioning of our political system, has in recent

years suffered drastic economic decline.

\* \* \* \* \* \*

"Advertising is the economic mainstay of the newspaper business. Generally, more than two-thirds of a newspaper's total revenues flow from the sale of advertising space. \* \* \* Obviously, newspapers must sell advertising to survive. And while newspapers in 1929 garnered 79% of total national advertising expenditures, by 1951 other mass media had cut newspapers' share down to 34.7%"

There must be space and room and subject matter involved to afford a competition such as the law requires and where these things do not exist then discontinuance of competition it has been held is not a violation of the anti-trust law. Judge Learned Hand observed in the United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 430:

"A market may, for example, be so limited that it is impossible to produce at all and meet the cost of production except by a plant large enough to supply the whole demand. Or there may be changes in taste or in cost which drive out all but one purveyor. A single producer may be the survivor out of a group of active competitors, merely by virtue of his superior skill, foresight and industry. In such cases a strong argument can be made that, although, the result may expose the public to the evils of monopoly, the Act does not mean to condemn the resultant of those very forces which it is its prime object to foster: finis opus coronat."

Justice Holmes has said that a man has a right to set up a shop in a small village which can support but one shop of the kind and although there may be one shop of the kind already in town. It then naturally follows that one of the two will have to go down. This is one of the penalties of the freedom of enterprise.

The parties to this case have very properly reduced to writing extensive stipulations thus saving a long record. Each stipulation is supported by facts that might have been produced in evidence in court. In the light of the facts as contained in these stipulations and in light of the testimony that has been offered in the case we are unable to find any well-defined issue of fact that may be submitted to the jury that has not already become a question of law which the Court must decide. In other words, what can the Court tell the jury to find from the evidence in this case that is not already apparent?

The case as developed does not disclose in our judgment any violation of the anti-trust law. It is therefore withdrawn from the jury and judgment entered for the defendants.