Norman F. HECHT, Harry Kagan and Marc A. Miller, joint venturers, Appellants,

Washington Federals, Inc., a corporation, et al.

v.

PRO–FOOTBALL, INC., a corporation, et al.

No. 75–1819.

United States Court of Appeals, District of Columbia Circuit.

Argued 20 Dec. 1976.

Decided 20 Dec. 1977.

William Joseph H. Smith, Washington, D. C., for appellants.

Bernard I. Nordlinger, Washington, D. C., with whom Robert B. Frank, Washington, D. C., was on the brief, for appellee, Pro-Football, Inc., also argued for appellee, D.C. Armory Board.

Louis P. Robbins, Principal Asst. Corp. Counsel for District of Columbia, Richard W. Barton, and Leo N. Gorman, Asst. Corp. Counsels, Washington, D. C., at the time the brief was filed, were on the brief for appellee, D.C. Armory Board. C. Francis Murphy, Corp. Counsel, Washington, D. C., at the time the record was filed, also entered an appearance for appellee, D.C. Armory Board.

Before McGOWAN, Circuit Judge, HARRISON L. WINTER,* Circuit Judge for the Fourth Circuit and WILKEY, Circuit Judge.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

This is a private antitrust action. Plaintiffs Hecht, Kagan, and Miller (hereafter collectively "Hecht") are a group of promoters who in 1965 sought unsuccessfully to obtain an American Football League (AFL) franchise for Washington, D.C. Defendants are Pro-Football, Inc., operator of the Washington Redskins (the Redskins), and the District of Columbia Armory Board, an unincorporated instrumentality of the District of Columbia which operates and maintains Robert F. Kennedy (RFK) Stadium under contract with the Interior Department.[1] The Armory Board leases RFK Stadium to the Redskins. Hecht attacks a restrictive covenant in that lease.[2]

Hecht contends that RFK Stadium is the only stadium in the Washington metropolitan area suitable for the exhibition of professional football games; that the restric-

---

* Sitting by designation pursuant to Title 28, U.S.C. § 291(a).

1. The land on which the stadium is located is owned by the United States.

2. The lease runs from 1961 to 1990. Paragraph II(e) thereof provides that "at no time during the term of this Lease Agreement shall the Stadium be let or rented to any professional football team other than the Washington Redskins." Plaintiffs'-Appellants' Appendix (App.) 34–35.

tive covenant prevented him from obtaining the use of the stadium; and that his inability to obtain the use of the stadium prevented him from submitting an acceptable franchise application to the AFL owners, and thus from competing with the Redskins in the Washington professional football market. Hecht's complaint alleges that the restrictive covenant constitutes a contract in restraint of trade, in violation of Sherman Act §§ 1 and 3;[3] and that the Redskins, in obtaining the covenant and refusing to waive it, have monopolized professional football in Washington, D.C., in violation of Sherman Act § 2.[4] The case was tried to a jury,[5] which rendered a verdict for defendants. Hecht appeals numerous instructions and evidentiary rulings. We reverse and remand for a new trial.

## I. FACTS

Formed in 1959–60 with eight franchised teams, the AFL by 1965 was seriously considering expansion. It planned to grant two new franchises, one to a city with an NFL franchise and one to a city with no professional football team. The granting of any new franchise required the affirmative votes of six clubs.

In June 1965 Hecht and his associates organized an original group of investors. This group had no football experience and limited financial strength, but possessed a general familiarity with business affairs.

Hecht sent a franchise application form to the AFL, and followed it with a meeting in late June with AFL Commissioner Foss. They discussed details of the application, the need for Hecht to bolster his group's financial position, and the feasibility of gaining access to RFK Stadium in view of the Redskins' lease. In that connection, Hecht and Foss discussed the advisability of soliciting the aid of the Interior Department in obtaining the use of RFK Stadium.

Shortly after this meeting, Hecht persuaded three additional investors to join his promotional group. These were men of considerable means. Hecht also met with Stewart Udall, then Secretary of the Interior. Udall apparently responded favorably to Hecht's proposal, and told Hecht that his staff would investigate the legality of the restrictive covenant in the Redskins' lease.

In July 1965 Hecht submitted a written offer to purchase an AFL franchise, couching the application in a form suggested by Commissioner Foss. During July and August there were numerous interchanges between Hecht and the AFL group, about which there was conflicting evidence. These events need not be detailed. Hecht presented evidence which tended to show that his promotional activities were serious and that at least some members of the AFL expansion committee favored his application; he presented one piece of evidence

**3.** Sherman Act § 1, 15 U.S.C. § 1 (Supp. V 1975) provides in pertinent part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . .

Sherman Act § 3, 15 U.S.C. § 3 (Supp. V 1975) provides in pertinent part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in any Territory of the United States or of the District of Columbia . . . or between any such Territory or Territories and any State or States or the District of Columbia, or with foreign nations, or between the District of Columbia and any State or States or foreign nations, is declared illegal.

**4.** Sherman Act § 2, 15 U.S.C. § 2 (Supp. V 1975) provides in pertinent part:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . . .

**5.** The trial was held on remand from this Court. *Hecht v. Pro-Football, Inc. (Hecht I)*, 144 U.S. App.D.C. 56, 72, 444 F.2d 931, 947 (1971), *cert. denied*, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972). In *Hecht I*, the district court granted summary judgment for the defendants on the ground that the Board's leasing of RFK Stadium was governmental action immune from the antitrust laws. We reversed and remanded for trial on the merits, concluding that Congress had evinced no intention to confer such immunity.

which suggested that if he got the stadium he would get the franchise. The Redskins presented evidence which tended to show that the AFL owners never seriously considered expansion to Washington and that Hecht's application never had a chance of being approved.

On 7 September 1965 Hecht submitted a written proposal to the Armory Board for shared use of RFK Stadium. The Board told Hecht that it could not negotiate a lease with him owing to the restrictive covenant in the Redskins' lease. The Board also said, however, that it would gladly consider any arrangement acceptable to the Redskins under which Hecht could use the stadium (i. e., a waiver of the restrictive covenant) and by which the Board's financial condition would be improved.[6] There was conflicting evidence about the practicality of any plan for sharing the stadium between two professional football teams.

On 4 October 1965 Hecht received a memorandum from the Interior Department expressing its opinion that the restrictive covenant in the Redskins' lease violated the antitrust laws. Hecht distributed copies of this memorandum to the AFL owners and to the Armory Board. Months of intermittent and frustrating meetings followed. The Redskins presented evidence which tended to show that they had reason to doubt the sufficiency of Hecht's financial resources and the integrity with which he pursued the negotiations. During this period, Hecht was whipsawed between the positions of the Redskins and the AFL. The Redskins would not seriously negotiate for Hecht's use of the stadium unless Hecht had an AFL franchise; the AFL would not seriously consider Hecht's application for a franchise unless he had the use of RFK Stadium. In his quandary, Hecht made

representations to both sides which were optimistic at best. In August 1966 the Redskins broke off negotiations. In October 1966 Hecht filed his original complaint in this action.

## II. OVERALL ANALYSIS

At the outset, the Redskins contend that we need not reach Hecht's various assignments of error because the trial conclusively demonstrated that Hecht lacks standing to sue. Section 4 of the Clayton Act confers the right to sue for treble damages on "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . ."[7] This section establishes a two-fold standing requirement: the plaintiff must show both an *injury-in-fact* to his "business or property" and a *causal connection* between that injury and the defendant's allegedly illegal acts.[8] The Redskins contend that Hecht has shown neither.

■■■■ First, they argue that Hecht's promotional group had a shifting and impermanent structure; that no money had been contributed or even committed by its members; that Hecht had no prospect of ever receiving a franchise; that Hecht failed to negotiate toward a franchise in a serious and businesslike manner; and that Hecht consequently lacked "business or property" for antitrust purposes. As will be pointed out more fully below,[9] however, the courts have generally not insisted that a plaintiff actually be engaged in a going business in order to have antitrust standing; it is sufficient if he has manifested an intention to enter the business and has demonstrated his preparedness to do so.[10] Our review of the record indicates that the evidence presented a question of fact for the jury on these

6. The Armory Board operated RFK Stadium at a net loss before depreciation in each year from 1966 to 1974. Transcript (Tr.) 721–24, App. 110–27.

7. 15 U.S.C. § 15 (1970).

8. *See* Berger & Bernstein, *An Analytical Framework for Antitrust Standing*, 86 Yale L.J. 809, 810–13 (1977).

9. *See* pp. —— —— of 187 U.S.App.D.C., p. 994 of 570 F.2d *infra.*

10. *See Martin v. Phillips Petrol. Co.*, 365 F.2d 629, 633–34 (5th Cir.), *cert. denied*, 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451 (1966).

issues. We cannot hold that Hecht lacked "business or property" as a matter of law.

Second, the Redskins argue that Hecht's inability to submit an acceptable franchise application was due entirely to his own bad faith in negotiating with them for use of RFK Stadium, and that Hecht consequently failed to show a causal connection between his injury and the restrictive covenant in the Redskins' lease. We find this argument sanctimonious and somewhat sophistical. The negotiations, plainly, were frustrating for all concerned. The question, in any event, was peculiarly one for the jury.[11] We cannot hold, in defiance of plain evidence and common sense, that the restrictive covenant was causally unrelated to the injury of which Hecht complains; the degree of causality may be another matter.

Having disposed of the Redskins' threshold contentions, we consider plaintiffs' various assignments of error.

## III. INSTRUCTIONS

### A. *Relevant Geographic Market.*

█ In suits brought under the Sherman Act the threatened foreclosure of competi-

tion must be assessed "in relation to the market affected."[12] The relevant product market in this case is indisputably the business of professional football. The parties disagree, however, as to the relevant geographic market. Hecht contends that it is the metropolitan area of Washington, D.C.; the Redskins contend that it is the entire United States. The trial judge effectively instructed the jury that the relevant geographic market was the nation as a whole.[13] We hold that his instruction was clearly erroneous as a matter of law.

The relevant geographic market is "the area of effective competition,"[14] the area "in which the seller operates, and to which the purchaser can practicably turn for supplies."[15] It is well settled that the relevant market "need not be nationwide,"[16] and that "where the relevant competitive market covers only a small area the Sherman Act may be invoked to prevent unreasonable restraints within that area."[17] Indeed, courts have regularly identified relevant geographic markets as single cities or towns, and even portions thereof.[18]

---

11. Indeed, the jury could have found that bad faith might more properly be attributed to the Redskins. Their protestations that they would have been only too happy to negotiate seriously with Hecht once he had a franchise ring hollow, for they knew full well that Hecht could not get a franchise until he had access to the stadium. There was certainly no willingness to negotiate any arrangement *conditioned on* Hecht's getting the AFL franchise; this might well have been all Hecht needed to obtain it. If the Redskins were as sure as they now assert they were that Hecht and associates could never have obtained a franchise because of lack of financial resources and other reasons, the Redskins could have avoided this lawsuit by waiving their restrictive covenant and then watching the AFL turn down the Hecht application.

12. *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961).

13. Although the trial judge purported to leave the question of relevant geographical area to the jury, Tr. 2833, he defined that area as the area of competition for football franchises. *See* p. —— of —— U.S.App.D.C., p. 989 of 570 F.2d *infra*. Since the trial established beyond peradventure that numerous cities were com-

peting for franchises, the judge's instruction virtually directed the jury to find a national market. Not surprisingly, the jury seems to have been confused by the "relevant market" instructions. *See* Tr. 2851–53.

14. *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 321, 328, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961).

15. *Id.,* at 327, 81 S.Ct., at 628, *quoted in United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 359, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

16. *Standard Oil Co. v. United States,* 337 U.S. 293, 299 n. 5, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949).

17. *United States v. Columbia Steel Co.,* 334 U.S. 495, 519, 68 S.Ct. 1107, 1120, 92 L.Ed. 1533 (1948).

18. *E. g., Times-Picayune Pub. Co. v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953) (relevant market is city of New Orleans); *Lorain Journal Co. v. United States,* 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951) (relevant market is city of Lorain, Ohio); *Kansas City Star Co. v. United States,* 240 F.2d 643 (8th Cir. 1957) (relevant market is Kansas City,

In this case Hecht sought to enter the market for professional football in Washington, D.C. He argues that the Redskins frustrated his entry by denying him use of RFK stadium, access to which was a condition precedent to his submitting a successful franchise application. Given this posture of the case, it seems evident that the relevant geographical market is the D.C. metropolitan area: it is here that "the seller operates;" It is here alone that the Redskins' customers (primarily, their ticket purchasers) can "practicably turn" for the supply of professional football. Hecht sought to compete for these customers by obtaining a franchise of his own, and it can scarcely be doubted that "the area of effective competition" between him and the Redskins would be the nation's capital.

The trial court, however, defined the relevant geographical market as "the area of effective competition for the acquisition, location and operation of a professional football franchise in the years 1965 and 1966." [19] It is true, of course, that Hecht had to "compete" with other cities before he could assure himself of a franchise for Washington; yet this is hardly the competition that is at issue here. Hecht is not complaining that the Redskins' restrictive covenant prevented him from entering "the national market for football franchises;" obviously, Hecht could have entered that market, notwithstanding the Redskins' lease, from any other city. Hecht is complaining, rather, that the restrictive covenant on RFK Stadium in Washington, D.C., prevented him from entering the market for professional football in Washington; this is "the area which the alleged restraints affect." [20] The "national competition" was but a preliminary, if necessary, step to a distinctly local end. We hold, therefore, that the trial judge erred in failing to instruct the jury that the relevant geographic market is the area of metropolitan Washington, D.C., in which Hecht and the Redskins would have effectively competed for customers.[21]

Mo.); *Gamco, Inc. v. Providence Fruit & Produce Bldg., Inc.,* 194 F.2d 484 (1st Cir.), *cert. denied,* 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1952) (relevant market is Providence, R.I.); *William Goldman Theatres, Inc. v. Loew's, Inc.,* 150 F.2d 738 (3d Cir. 1945), *cert. denied,* 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742 (1948) (relevant market is downtown theatre district).

19. Tr. 2833, 2863.

20. *United States v. Columbia Steel Co.,* 334 U.S. 495, 520, 68 S.Ct. 1107, 1120, 92 L.Ed. 1533 (1948). Defendants' citation of *American Football League v. National Football League,* 323 F.2d 124 (4th Cir. 1963), is inapposite. That case concerned the "competition between the leagues for franchise locations;" since each league was considering expansion to a host of desirable sites, the court properly held that the market, geographically, was "at least as broad as the United States, including Hawaii and portions of Canada." 323 F.2d at 130. This case, by contrast, concerns the potential competition between two teams for customers in one location. Unlike the NFL, the Redskins as "sellers" do not operate nationally; unlike the AFL, Hecht is not trying to expand nationally. He sought merely to compete with the Redskins on their home turf.

21. These customers would include potential season ticket holders and occasional ticket buyers, and, to a lesser extent, purchasers of local radio and pre-season television broadcasting rights. Most of a professional football team's broadcasting revenue, of course, derives from the national television contract, which is negotiated by the league. As testimony at trial indicated, however, individual teams have very little control over the revenue they derive from this contract, and thus the most important factor in considering location of a franchise is the potential "gate" in the home city. Tr. (4 Apr. 1975) at 31. For this reason, national television audiences and national television contract revenues should be ignored in ascertaining the relevant market here. *Cf. United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 361, 83 S.Ct. 1715, 1740, 10 L.Ed.2d 915 (1963) (holding relevant market to be metropolitan area of Philadelphia, Pa.):

> [In ascertaining the relevant geographic market,] a workable compromise must be found: some fair intermediate delineation which avoids the indefensible extremes of drawing the market either so expansively as to make the effect of the merger upon competition seem insignificant, because only the very largest . : . customers are taken into account in defining the market, or so narrowly as to place appellees in different markets, because only the smallest customers are considered.

*See generally* P. Areeda, Antitrust Analysis ¶ 231 (2d ed. 1974).

**B.** *Monopolistic Intent and "Natural Monopoly."*

 The offense of "monopolization" under Sherman Act § 2 implicates both the possession of monopoly power—"monopoly in the concrete" [22]—and an element of willfulness or intent.[23] To demonstrate intent to monopolize, however, a plaintiff need not always prove that the defendant acquired or maintained his monopoly power by means of exclusionary, unfair, or predatory acts. At least since *Alcoa,*[24] it has been clear that the requisite intent can be inferred if a defendant maintains his power by conscious and willful business policies, however legal, that inevitably result in the exclusion or limitation of actual or potential competition.[25] In accordance with *Alcoa,* Hecht requested an instruction that the jury could find monopolistic intent if it found that the Redskins had consciously engaged in acts or contracts, whether lawful or unlawful, that "maintained and protected" their monopoly over professional football in Washington. The trial judge refused to give this instruction. Instead, he ruled that the *Alcoa* theory of intent (*viz.,* an inference of monopolistic intent without a showing of specific unfair practices) was not available to Hecht unless he proved that the Washington metropolitan area could

support two professional football teams. We hold that this instruction was error.

 In order to explain the trial judge's chain of reasoning, it is necessary to elaborate somewhat the teaching of *Alcoa.* In that opinion, Judge Hand recognized, as noted above, that monopolistic intent may be inferred from conscious business practices that inevitably produce or maintain monopoly power. Judge Hand also recognized, of course, that there are situations in which an inference of monopolistic intent absent a showing of specific unfair practices would be improper. One such situation is where defendant has a "natural monopoly"—where, in Judge Hand's words, "[a] market [is] so limited that it is impossible to produce at all and meet the cost of production except by a plant large enough to supply the whole demand." [26] In the wake of *Alcoa,* accordingly, a substantial body of case law has developed, holding that the "characteristics of a natural monopoly make it inappropriate to apply the usual rule that success in driving competitors from the market is evidence of illegal monopolization." [27] These cases hold, in short, that a natural monopolist does not violate § 2 unless he "acquired or maintained [his] power through the use of means which are 'exclusionary, unfair or predatory.' " [28] In this case, therefore, the trial

---

**22.** *Standard Oil Co. v. United States,* 221 U.S. 1, 62, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

**23.** *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *United States v. Griffith,* 334 U.S. 100, 107, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); *Yoder Bros., Inc. v. California-Florida Plant Corp.,* 537 F.2d 1347, 1366 (5th Cir. 1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977).

**24.** *United States v. Aluminum Co. of America,* 148 F.2d 416 (2d Cir. 1945) (Learned Hand, J.).

**25.** *Id.* at 428–31. *See, e. g., United States v. Griffith,* 334 U.S. 100, 105–08, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); *Helix Milling Co. v. Terminal Flour Mills Co.,* 523 F.2d 1317, 1321 (9th Cir. 1975), *cert. denied,* 423 U.S. 1053, 96 S.Ct. 782, 46 L.Ed.2d 642 (1976); *United States v. United Shoe Mach. Corp.,* 110 F.Supp. 295, 344–45 (D.Mass.1953), *aff'd per curiam,* 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954).

**26.** *United States v. Aluminum Co. of America,* 148 F.2d at 430. *See* C. Kaysen & D. Turner, Antitrust Policy 191 (1959):

*Natural monopoly.* In the economic sense, natural monopoly is monopoly resulting from economies of scale, a relationship between the size of the market and the size of the most efficient firm such that one firm of efficient size can produce all or more than the market can take at a remunerative price, and can continually expand its capacity at less cost than that of a new firm entering the business.

**27.** *Greenville Pub. Co., Inc. v. Daily Reflector, Inc.,* 496 F.2d 391, 397 (4th Cir. 1974).

**28.** *Ovitron Corp. v. General Motors Corp.,* 295 F.Supp. 373, 378 (S.D.N.Y.1969), *quoting American Football League v. National Football League,* 323 F.2d 124, 131 (4th Cir. 1963). *See, e. g., John Wright & Assoc., Inc. v. Ullrich,* 328 F.2d 474, 479 (8th Cir. 1964); *Union Leader Corp. v. Newspapers of New England, Inc.,* 284 F.2d 582, 584 (1st Cir. 1960); *Philadelphia*

judge properly told the jury that if it found the Redskins to have a natural monopoly, "such a monopoly does not violate the antitrust laws unless it was acquired or maintained by exclusionary, unfair, or predatory means."[29]

■ The trial judge further instructed the jury, however, that Hecht bore the burden of proving that the Redskins did *not* have a natural monopoly:[30]

In this connection, you are instructed that an established operating professional football team may be said to have a natural monopoly in a particular city, if that city cannot support two professional teams under existing circumstances. Accordingly, the plaintiffs must prove by a preponderance of the evidence that [the D.C. metropolitan area,] in 1965 and 1966, could have reasonably supported both the defendant Redskins and an [AFL] team.

This part of the instruction, we think, was incorrect. It is the clear thrust of *Alcoa* that, once a plaintiff has proven the defendant's maintenance of its monopoly power through conscious business practices, a rebuttable presumption is established that defendant has the requisite intent to monopolize. The defendant can defeat this presumption by showing that it had monopoly, as some have greatness, "thrust upon it"[31] —that its power derives from "superior

skill, foresight and industry" or (as is particularly relevant here) from the advantages of natural monopoly conditions.[32] Both the Supreme Court, and the lower courts, have echoed this position.[33] We are not called upon in this case to elaborate the various circumstances under which the burden of proof in § 2 cases might shift to defendant; we hold merely that when, as here, a defendant seeks to avoid a charge of monopolization by asserting that it has a natural monopoly owing to the market's inability to support two competitors, the defendant, and not the plaintiff, bears the burden of proof on that score.

This holding finds firm grounding in antitrust policy. To hold otherwise could effectively mean that a defendant is entitled to remain free of competition unless the plaintiff can prove, not only that he would be a viable competitor, but also that he and defendant both would survive. This result would be ironic indeed: we cannot say that it is in the public interest to have the incumbent as its sole theatre, or its sole newspaper, or its sole football team, merely because the incumbent got there first. Assuming that there is no identity of performance, the public has an obvious interest in competition, "even though that competition be an elimination bout."[34] "It has been the

*World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.,* 351 F.Supp. 457, 511 (E.D.Pa. 1972); *United States v. Harte-Hanks Newspapers, Inc.,* 170 F.Supp. 227, 229 (N.D.Tex.1959).

29. Tr. 2832, 2862.

30. Tr. 2832, 2862; *cf.* Tr. 2703–06.

31. *United States v. Aluminum Co. of America,* 148 F.2d at 429.

32. *Id.* at 429–30.

33. *See United States v. E. I. DuPont de Nemours & Co.,* 351 U.S. 377, 392, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956) ("[T]his Court [has concluded] in prior cases that, when an alleged monopolist has power over price and competition, an intention to monopolize in a proper case may be assumed") (footnote omitted); *Standard Oil Co. v. United States,* 221 U.S. 1, 75, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *United States v. Grinnell Corp.,* 236 F.Supp. 244, 248 (D.R.I.1964) (Wyzanski, J.), *aff'd and remanded*

*on the question of relief,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) ("[O]nce the Government has borne the burden of proving what is the relevant market and how predominant a share of that market defendant has, it follows that there are rebuttable presumptions that defendant has monopoly power and has monopolized in violation of § 2"); *United States v. United Shoe Mach. Corp.,* 110 F.Supp. 295, 342, 343–46 (D.Mass.1953) (Wyzanski, J.), *aff'd per curiam,* 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954). *But see United States v. Grinnell Corp.,* 384 U.S. at 576 n. 7, 86 S.Ct. at 1707 ("Since the record clearly shows that this monopoly power was consciously acquired, we have no reason to reach the further position of the District Court that once monopoly power is shown to exist, the burden is on the defendants to show that their dominance is due to skill, acumen, and the like").

34. *Union Leader Corp. v. Newspapers of New England, Inc.,* 284 F.2d 582, 584 n. 4 (1st Cir. 1960). *See Greenville Pub. Co., Inc. v. Daily*

law for centuries," Justice Holmes once wrote, "that a man may set up a business in a small country town, too small to support more than one, although thereby he expects and intends to ruin some one already there, and succeeds in his intent." [35] The newcomer and the incumbent may both succeed, or either or both may fail; this is what competition is all about.

## C. Essential Facility.

 Hecht contends that the District Court erred in failing to give his requested instruction concerning the "essential facility" doctrine. We agree. The essential facility doctrine, also called the "bottleneck principle," states that "where facilities cannot practicably be duplicated by would-be

competitors, those in possession of them must allow them to be shared on fair terms. It is illegal restraint of trade to foreclose the scarce facility." [36] This principle of antitrust law derives from the Supreme Court's 1912 decision in *United States v. Terminal R. R. Ass'n,*[37] and was recently reaffirmed in *Otter Tail Power Co. v. United States*; [38] the principle has regularly been invoked by the lower courts.[39] To be "essential" a facility need not be indispensable; it is sufficient if duplication of the facility would be economically infeasible and if denial of its use inflicts a severe handicap on potential market entrants.[40] Necessarily, this principle must be carefully delimited: the antitrust laws do not require that an essential facility be shared if such sharing would be impractical or would in-

---

Reflector, Inc., 496 F.2d 391, 397 (4th Cir. 1974).

**35.** *Vegelahn v. Gunter,* 167 Mass. 92, 44 N.E. 1077, 1080 (1896).

**36.** A. D. Neale, The Antitrust Laws of the United States 67 (2d ed., 1970); *id.* at 66–69, 127–31. *See* L. A. Sullivan Antitrust 131 (1977):
[I]f a group of competitors, acting in concert, operate a common facility and if due to natural advantage, custom, or restrictions of scale, it is not feasible for excluded competitors to duplicate the facility, the competitors who operate the facility must give access to the excluded competitors on reasonable, non-discriminatory terms.

**37.** 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912). In *Terminal R.R.,* a group of railroads had won control of all railroad switching facilities in St. Louis; topographical factors prevented potential competitors from gaining access to the city via other routes. The Court held:
[W]hen, as here, the inherent conditions are such as to prohibit any other reasonable means of entering the city, the combination of every such facility under the exclusive ownership and control of less than all of the companies under compulsion to use them violates both the first and second sections of the [Sherman Act].
*Id.* at 409, 32 S.Ct. at 515. The Court ordered the railroads to amend their agreement to provide "for the admission of any existing or future railroad to joint ownership and control of the combined terminal properties" on equal terms. *Id.* at 411, 32 S.Ct. at 516.

**38.** 410 U.S. 366, 377–78, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), *affirming in relevant part* 331 F.Supp. 54, 59–61 (D.Minn.1971). In *Otter Tail,* municipalities sought to compete with de-

fendant power company by building their own electric facilities. The municipalities could not afford to construct their own subtransmission lines, however, and defendant refused to "wheel" power for them over its own lines. The court found that Otter Tail's subtransmission lines were a scarce facility and that its refusal to share them violated § 2. 331 F.Supp. at 61.

**39.** *E. g., Helix Milling Co. v. Terminal Flour Mills Co.,* 523 F.2d 1317, 1320 (9th Cir. 1975), *cert. denied,* 423 U.S. 1053, 96 S.Ct. 783, 46 L.Ed.2d 642 (1976) (plaintiff, whose mill had been destroyed by fire, sought to buy defendant's mill; defendant instead sold it to plaintiff's pre-fire competitor; *held,* plaintiff stated a cause of action under § 1: "In a closed market, where the acquisition of existing production facilities is the only economically feasible method of entry, an agreement to acquire the only available facilities necessarily excludes a potential entrant."); *United States v. Standard Oil Co.,* 362 F.Supp. 1331, 1341 (N.D.Cal.1972), *aff'd on appeal,* 412 U.S. 924, 93 S.Ct. 2750, 37 L.Ed.2d 152 (1973) (defendant had rights to exclusive use of fuel storage facilities essential to give potential competitors access to airport; *held,* defendant violated § 3 and was "ordered to take all necessary steps so as to enable other suppliers or distributors of petroleum products to use an adequate portion of the . . . storage facilities on a shared cost basis to enable said suppliers or distributors to compete in the Samoan market").

**40.** *See Helix Milling,* 523 F.2d at 1320; *Otter Tail,* 331 F.Supp. at 60, 61; A. D. Neale, *supra* note 36 at 68, 131.

hibit the defendant's ability to serve its customers adequately.[41]

■ In this case Hecht presented evidence that RFK stadium is the only stadium in the D.C. metropolitan area that is suitable for the exhibition of professional football games.[42] He also presented evidence that proper agreements regarding locker facilities, practice sessions, choice of playing dates, and so forth would have made sharing of the stadium practical and convenient.[43] Accordingly, Hecht requested an instruction that if the jury found (1) that use of RFK stadium was essential to the operation of a professional football team in Washington; (2) that such stadium facilities could not practicably be duplicated by potential competitors; (3) that another team could use RFK stadium in the Redskins' absence without interfering with the Redskins' use; and (4) that the restrictive covenant in the lease prevented equitable sharing of the stadium by potential competitors, then the jury must find the restrictive covenant to constitute a contract in unreasonable restraint of trade, in violation of Sherman Act §§ 1 and 3.[44] This instruction was substantially correct and failure to give it was prejudicial error.[45]

### D. Business or Property.

■ Under § 4 of the Clayton Act a plaintiff has standing to complain of an antitrust infraction only if he has been "injured in his business or property" by reason of the defendant's acts.[46] Hecht contends that the trial judge erred in failing to make the disjunctive character of this requirement sufficiently clear to the jury. Although we would not reverse on this point alone, we think Hecht's contention has merit.[47] On remand, the trial judge should take greater care to instruct the jury that it need only find that plaintiffs sustained injury *either* to their business *or* to their property, and that it need not find that they sustained injury to both.

**41.** *See Otter Tail,* 410 U.S. at 378, 381, 93 S.Ct. 1022; L. A. Sullivan, *supra* note 36 at 127–28; A. D. Neale, *supra* note 36 at 131.

**42.** Tr. 243–44, 304–05, 1298–99.

**43.** Tr. 244–45.

**44.** App. 146. It seems clear that the essential facility doctrine would also support an allegation that the Redskins' refusal to waive the restrictive covenant constituted illegal monopolization under § 2. *See* note 11 *supra*. *Cf. Otter Tail, supra* note 38 and *Terminal R.R., supra* note 37. Hecht, however, did not request an instruction to this effect.

**45.** Defendants offer two objections to this conclusion. First, they argue that the requested instruction presupposes the area of competition to be restricted to Washington, D.C. In view of our disposition of the relevant market issue, *supra* p. —— of 187 U.S.App.D.C., p. 990 of 570 F.2d, this argument need not detain us further. Second, defendants argue that, notwithstanding the essential facility doctrine, the jury could still have found the restrictive covenant *reasonable. See* pp. —— – —— of 187 U.S. App.D.C. pp. 995–996 of 570 F.2d *infra.* This argument robs the essential facility doctrine of any significance, and we reject it. The garden-variety restrictive covenant does not violate § 1 unless it unreasonably restrains trade; when the restrictive covenant covers an essential facility, however, all possible competition is by defini-

tion excluded and the restraint is thus unreasonable *per se*—provided, of course, that the facility can be shared practically. The requested instruction adequately accommodated this *proviso.*

**46.** 15 U.S.C. § 15 (1970).

**47.** In the course of a seven-page instruction on the meaning of "business or property," the judge's *only* reference to the "either/or" nature of the statutory requirement was as follows: "Section 4 of the Clayton Act, to which I have referred, uses the words 'injury to business or property.' Thus, business and property are words in the disjunctive." Tr. 2823. Plaintiff requested the judge to amend his instruction: "[W]hen you use the word disjunctive, I would like you to sort of explain that [it means] either one or the other must be injured." Tr. 2684. The judge refused. *Id.* During its deliberations, the jury asked to hear the instruction on "injury to property" again. Plaintiff again asked the judge to make clear to the jury that they had to "find either damage to property or to business." Tr. 2852. The judge again refused. *Id.* The final paragraph of the "property" instruction might be taken to imply that the jury had to find an injury to property if Hecht were to have standing. *See* Tr. 2856. The record suggests no reason for the trial judge's refusal to offer the relatively simple yet important clarification requested.

Hecht also contends that the trial court erred in failing to give his requested instructions on the meaning of "business" and "property." We disagree, and hold that the trial judge's instructions on this score were substantially correct.

■ Hecht argues that "*promotion* of obtaining a professional football franchise" is, without more, "business" for purposes of § 4.[48] His experts testified that "promotion" is an important part of business.[49] It is true, of course, that every business must have had a promotional stage, since every business must have started somewhere; and that promotion is important to the mature business, as conception is "important" to the adult. But it does not follow from this that promotion *is* business, at least not for purposes of the antitrust laws. One can be a "promoter" though he be a pauper, a tyro, and a dreamer; it is a question of where the line shall be drawn. Uniformly, the courts have drawn the line at the point where promotion transcends the level of hopes, desires, and expectations, and reaches a certain stage of maturity and concreteness, a stage where it is accompanied by certain indicia of ultimate success.[50] Put another way, the courts have held that a potential competitor cannot achieve standing merely by demonstrating his *intention* to enter a field; he must also demonstrate his *preparedness* to do so.[51] Indicia of preparedness include adequate background and experience in the new field, sufficient financial capability to enter it, and the taking of actual and substantial affirmative steps toward entry, "such as the consummation of relevant contracts and procurement of necessary facilities and equipment."[52] The district judge painstakingly explained these factors to the jury,[53] and his instruction correctly stated the law.

■ Alternatively, Hecht contends that the "negotiation of contracts" constitutes "business"[54] and that the "right to negotiate a lease or a contract constitutes 'property'"[55] under the antitrust laws. Of course, the courts generally have held that a valid and binding contract constitutes "property," injury to which will give a plaintiff standing under § 4.[56] But they have uni-

**48.** Plaintiffs' Revised Instruction No. 17, App. 138–39 (emphasis added); Brief at 30–31.

**49.** Tr. (4 Apr. 1975) at 89–90.

**50.** *See* L. A. Sullivan, *supra* note 36 at 772 ("plans and preparations to enter into a business constitute business or property . . . if they have materialized sufficiently to constitute an asset of reasonably determinate value which might, for example, be bought and sold or taxed, and which is capable of being appraised") (citing cases); ABA, Antitrust Law Developments 262 (1975) ("injury to an enterprise in the planning stage is equally actionable as injury in the operating stage provided a sufficiently advanced state of preparation for entering a market has been achieved") (citing cases). *Compare Broadcasters, Inc. v. Morristown Broadcasting Corp.*, 185 F.Supp. 641 (D.N.J.1960) (plaintiff applied for FCC license to construct radio station and was allegedly impeded by defendants' conduct; *held,* plaintiff lacked standing because he "entertained nothing more than an expectation" that he would be engaged in business if license were granted) *with Deterjet Corp. v. United Aircraft Corp.*, 211 F.Supp. 348 (D.Del.1962) ("fledgling" corporation had standing where it had facilities to produce new device, including leased building, necessary machines, and arrangements for products).

**51.** *E. g., Woods Explor. & Prod. Co. v. Aluminum Co. of America*, 438 F.2d 1286, 1310 (5th Cir. 1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972) (citing cases); *Martin v. Phillips Petrol. Co.*, 365 F.2d 629, 633–34 (5th Cir.), *cert. denied,* 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451 (1966); *Denver Petrol. Co. v. Shell Oil Co.*, 306 F.Supp. 289, 307–08 (D.Colo.1969) (citing cases).

**52.** *Id.* at 308. *See, e. g., Martin v. Phillips Petrol. Co.*, 365 F.2d 629, 633–34 (5th Cir.), *cert. denied,* 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451 (1966); *Waldron v. British Petrol. Co.*, 231 F.Supp. 72, 81–82 (S.D.N.Y.1964).

**53.** Tr. 2821–23.

**54.** Brief at 32, 33.

**55.** *Id.* at 34–36; Plaintiffs' Instr. No. 19, App. 141–42.

**56.** *See, e. g., E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Comm.*, 467 F.2d 178, 184 (5th Cir. 1972), *cert. denied,* 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973); *Waldron v. British Petrol. Co.*, 231 F.Supp. 72, 86–87 (S.D.N.Y.1964) (citing *North Texas Producers Ass'n v. Young*, 308 F.2d 235, 243 (5th

formly held that mere negotiations toward contracts are not "business or property" deserving of antitrust protection.[57] Everyone has the "right" to negotiate contracts; if, as Hecht contends, "all interests that the law protects" constitute "property" within the meaning of § 4,[58] standing is conferred on all the world. The statutory words cannot so lightly be robbed of meaning. The trial judge's "property" instruction, while perhaps subject to some clarification,[59] sufficiently conveyed by examples the substance of what was at issue. The court correctly refused to give the instruction that Hecht requested.

### E. Unreasonable Restraint of Trade.

Under the rule of Standard Oil Co. v. United States,[60] § 1 of the Sherman Act condemns only unreasonable restraints of trade. The trial judge instructed the jury as to the various factors it should consider in determining whether the Redskins' restrictive covenant was an unreasonable restraint.[61] This instruction was based on Justice Brandeis' oft-quoted language in Chicago Board of Trade v. United States,[62] and was, as far as it went, correct.

■ Hecht contends, however, that the instruction was incomplete: although the court told the jury what factors to consider, it failed to tell them what those factors must prove—it failed, in other words, to explain what an unreasonable restraint was. Hecht argues that the jury should have been instructed that a restraint is unreasonable if it "has a substantially adverse effect upon competition . . . , that is, [if] it suppresses or prevents competition."[63] This is the standard definition of an "unreasonable" restraint, sanctioned

Cir. 1962), cert. denied, 372 U.S. 929, 83 S.Ct. 874, 9 L.Ed.2d 733 (1963)). But see VTR, Inc. v. Goodyear Tire & Rubber Co., 303 F.Supp. 773, 783 (S.D.N.Y.1969) (no property interest in contract where benefits subject to termination by unilateral action of other party).

57. See, e. g., Peller v. International Boxing Club, Inc., 227 F.2d 593, 595–96 (7th Cir. 1955) (negotiations toward promotion of professional boxing match, including preliminary financial arrangements, "informal understanding," and conversations with boxers, not business or property under § 4; plaintiff "at most . . . desired to enter the business"); Brownlee v. Malco Theatres, Inc., 99 F.Supp. 312, 317 (W.D. Ark.1951) (failure of plaintiff's negotiations for purchase of theatre "did not injure him in his business or property any more than it may have injured any member of the general public who might have been desirous of buying the property"). Utah Gas Pipelines Corp. v. El Paso Nat. Gas Co., 233 F.Supp. 955 (D.Utah 1964), cited by Hecht, is not to the contrary. Utah Gas held that a corporation, which had been formed for the purpose of constructing a pipeline and which had "partially implemented its plans to construct, own and operate" the pipeline, id. at 957, had "business or property" under § 4 even though it had not yet obtained a certificate of public convenience from the state regulatory commission. The court did not hold that "negotiations for contracts" without more conferred standing under § 4. Nor does Washington Prof. Basketball Corp. v. National Basketball Ass'n, 147 F.Supp. 154 (S.D.N.Y.1956), stand for the proposition that mere negotiations confer standing. In that case, which

arose on a motion to dismiss, there was a question of fact as to whether a binding contract had been entered into. Id. at 155.

58. Plaintiffs' Instr. No. 19, App. 141–42.

59. The judge defined property as "the possession of something that deserves legal protection," Tr. 2823, and told the jury to consider all evidence it regarded as "pertinent to the question of whether the plaintiffs possessed property . . . which deserved legal protection." Tr. 2825. The instruction was somewhat circular, for it assumed that the jury already knew which species of alleged "property" deserved legal protection and which did not.

60. 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

61. Tr. 2827–28.

62. 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918), quoted in Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49, 97 S.Ct. 2549, 2557–58 n. 15, 53 L.Ed.2d 568 (1977):

To determine [whether a restraint is unreasonable] the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

63. Plaintiffs' Instr. No. 23A, App. 145.

both by *Chicago Board of Trade*[64] and later cases,[65] and the trial judge should have included it in his instruction.

■ Elaborating the *Chicago Board of Trade* factors, the judge told the jury that in considering whether the restrictive covenant was reasonable they should "consider whether the provision [was] fairly related to business considerations that the Redskins or the Armory Board had to deal with at the time they entered into the lease."[66] The court thus implied that if there existed good business reasons for the restrictive covenant the jury should not find the restraint unreasonable. As Hecht points out, however, it is settled that the "antitrust outcome does not turn merely on the presence of sound business reason or motive" and that the "promotion of self-interest alone does not invoke the rule of reason to immunize otherwise illegal conduct."[67] The latter part of the judge's instruction was thus misleading and should have been deleted.

### F. Proximate Cause.

Hecht contends that the trial judge neglected to instruct the jury clearly that the restrictive covenant need not be the *sole* cause of Hecht's failure to obtain a franchise, but merely a proximate cause. However, the judge stated plainly that proximate causation "does not mean that the law seeks and recognizes only one proximate cause of an injury" and that, "[t]o the contrary, several factors . . . may work concurrently as the efficient causes of an injury, and, in such case, each of the participating acts or omissions is regarded in law as a proximate cause."[68] Although the judge might well have incorporated phrases like "substantial factor" and "material contributing cause" into his instruction, as Hecht requested,[69] failure to do so did not make the instruction inadequate, misleading, or incomprehensible.

## IV. EVIDENTIARY RULINGS

### A. Hecht's Dealings with the Interior Department.

■ The trial court excluded from evidence all testimony and documents relating to Hecht's activities in obtaining and using the assistance of the Interior Department in his effort to win a franchise. This testimony concerned Hecht's meetings with the Department staff (including the Secretary); the Department's favorable response to Hecht and its willingness to draft a memorandum in support of his application; the Department's conclusion, expressed in a memorandum of law, that the restrictive covenant in the Redskins' lease was illegal; and the delivery of this memorandum to the AFL owners and the Armory Board. Hecht does not seriously contend that the trial court erred in refusing to admit the memorandum itself into evidence.[70] Hecht does

---

**64.** 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918) ("The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.")

**65.** *E. g., United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 375, 87 S.Ct. 1856, 1863, 18 L.Ed.2d 1249 (1967) (inquiry in assessing whether restraint is unreasonable is whether "the effect upon competition in the marketplace is substantially adverse").

**66.** Tr. 2828.

**67.** *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 375, 87 S.Ct. 1856, 1863, 18 L.Ed.2d 1249 (1967). This aspect of *Schwinn* was not affected by the Court's decision in *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). *Continental*

overruled *Schwinn* insofar as *Schwinn* held certain vertical territorial restraints illegal *per se.*

**68.** Tr. 2838.

**69.** Plaintiffs' Instr. No. 32, App. 149.

**70.** Revelation of the Department's legal opinion would have been both highly prejudicial to defendants, Fed.R.Ev. 403, and without value to the jury, Fed.R.Ev. 702. *See* C. McCormick, Evidence 26–27 (2d ed. E. Cleary 1972); J. Wigmore, 7 Evidence § 1952 at 81–82 (1940). Hecht admits in brief that he "has been unable to find any . . . support" for the memorandum's admissibility, Brief at 16, and seemingly agreed at trial that the memorandum should not be admitted. *See* Tr. 1416–17.

contend, however, that all the Interior Department material other than the Department's legal opinion should have been admitted, including evidence that the "memorandum supported the use of the stadium by two teams." [71] The trial judge refused to admit this material into evidence on the ground that its probative value was outweighed by its prejudicial effect. We. hold that this was a proper exercise of his discretion. [72]

Admission of the Interior Department material would have prejudiced the Redskins in two ways. First, as defendants argue, it might well have been impossible to permit Hecht "to adduce before the jury the details of his dealings with Interior without letting the jury know about Interior's legal opinion on the validity of the Redskins' lease." [73] But risk of divulging the Interior Department's conclusion of law is not the only, or even the most serious, source of prejudice here. The mere fact that the Government was cooperating with Hecht and favored his proposal—the fact that the Government was "rooting" for him to win—would have portrayed the Redskins as obstructing the will of the people in pursuit of their own selfish ends. [74] Whose side the Government was on, of course, is of no conceivable relevance to the issues the jury had to decide, and we cannot doubt

that disclosure of its partisanship would severely have prejudiced the Redskins' position. The probative value of the Interior Department material, on the other hand, seems slight. Most of the evidence excluded was, by Hecht's admission, circumstantial; [75] and the record contains ample evidence for almost all the propositions which Hecht wished to use the Interior Department material to support. [76] On balance, the judge's decision to exclude the material was well within his discretion.

### B. *The Promoters' Percentage Interests.*

The trial judge excluded from evidence all testimony concerning an alleged oral agreement among the promoters dictating their percentage shares in the prospective franchise. This testimony was excluded because Hecht's pretrial narrative statements did not specifically allege such an agreement; the pretrial order said that factual contentions omitted from the narrative statements would be deemed abandoned. [77] The judge declined to amend the order to permit introduction of the testimony, reasoning that amendment was not required "to prevent manifest injustice." [78] We hold that the exclusion of this testimony was error. In so holding, however, we do not consider whether admission of the testimony was mandated under the "mani-

---

**71.** Brief at 16.

**72.** A trial judge, of course, is accorded great deference in exercising his discretion to exclude prejudicial evidence. *See* J. Weinstein, 1 Evidence ¶ 403[03] at 403–20 (1976).

**73.** Brief at 27.

**74.** The Department of the Interior and the Armory Board had a thoroughly practical public interest motive in supporting Hecht's efforts to land an AFL franchise for Washington, *i. e.,* the increased stadium rentals would reduce the persistent stadium operating deficit and save taxpayer money. *See* p. —— of 187 U.S.App. D.C., p. 987 of 570 F.2d and note 6 *supra.*

**75.** *See* Brief at 14–15.

**76.** Hecht argues that this material evidenced the seriousness of his promotional activities, the favorable disposition of Commissioner Foss toward his application, and the reason for his three-month delay in submitting a proposal to

the Armory Board for use of RFK Stadium. *See* p. —— of 187 U.S.App.D.C., p. 987 of 570. F.2d *supra.* The record contains a great deal of evidence on the first two issues. The record does not seem to contain any other evidence on the third issue. Although we hold that the trial judge did not abuse his discretion in excluding the Interior Department material, our holding will not bar Hecht from attempting to introduce on retrial some portion of the material for the limited purpose of explaining his delay, provided that this can be done without prejudicing the Redskins by revealing the Department's legal opinion or general support for Hecht. We leave this to the sound discretion of the trial judge on remand.

**77.** Defendants'-Appellees' Appendix 148–49.

**78.** Under F.R.Civ.P. 16, the pretrial order "controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice."

fest injustice" rule. In our view, the pretrial order did not need to be amended, for Hecht's allegations as to the oral agreement were fairly comprised within the factual contentions that his pretrial statement contained.

In that statement, Hecht contended that his promotional group was "financially able" to purchase a franchise,[79] and that the promotion "always had available to it the support of local businessmen who were ready, willing and able to supply the money required. . . ."[80] It was clear from the outset that Hecht and his original investors had limited financial resources, and that the financial strength of the promotional group derived largely from the more moneyed investors who came in later. It must be assumed that these "additional investors"[81] would contribute capital only in proportion to their percentage interest in the franchise. In order to show that the group as a whole was "financially able," therefore, Hecht obviously had to show that its financially able members, i. e., the "additional investors," were going to own a large percentage share. This he proposed to do by offering evidence of an oral agreement under which the "additional investors" were to own at least 51% of the franchise, while Hecht would retain only 10%.[82]

We think that evidence of some such agreement was necessarily implicated in Hecht's factual contention that his group was "financially able". Unless the jury was to be expected to assume that the additional investors' motivations were eleemosynary, Hecht could not demonstrate financial

ability merely by reciting that they "belonged" to his group; he had to show that they had a controlling stake in it. For this reason, testimony as to the alleged oral agreement was encompassed within Hecht's pretrial narrative statement and there was thus no bar to its admission.[83]

### C. Expert Testimony.

■ The trial judge admitted into evidence testimony of plaintiffs' experts that it was customary and usual business practice for tenants and landlords in the D.C. area to bargain for restrictive covenants in leases. Hecht argues that this testimony was irrelevant and should have been excluded. We agree. The witnesses concededly possessed no expertise about football stadiums, and testified only about garden-variety commercial leases.[84] There is, however, no analogy between a shopping center lease which, e. g., stipulates that only one drug store can rent space in the center, and the restrictive covenant in the Redskins' lease: another drug store can be built down the road, whereas RFK Stadium is an essential facility that cannot be duplicated.[85] It is settled, moreover, that evidence of customs and practices in an industry is irrelevant in determining whether the defendant has violated the antitrust laws.[86] Although we would not reverse on this point alone, we conclude that the trial judge erred in admitting the experts' testimony.

### CONCLUSION

Because the trial judge erred in giving, or failing to give, at least four important in-

**79.** App. 134.

**80.** Id. at 135–36.

**81.** Id. at 135.

**82.** The remaining 39% was to be owned by the original investors whom Hecht listed in his June 1965 application for an AFL franchise, prior to his meeting with Commissioner Foss. See p. —— of 187 U.S.App.D.C., p. 986 of 570 F.2d supra.

**83.** The Redskins argue that the recitals in Hecht's pretrial statement gave them no notice "that plaintiffs were claiming to have advanced their promotion to the point of specific owner-

ship agreements." Brief at 29. Defendants, we think, unduly impugn their deductive powers. In any event, the Redskins will have ample notice of plaintiffs' contentions on retrial.

**84.** Tr. 2056–58.

**85.** See pp. —— —— of 187 U.S.App.D.C., pp. 992–993 of 570 F.2d supra.

**86.** E. g., United States v. National City Lines, Inc., 186 F.2d 562, 572 (7th Cir.), cert. denied, 341 U.S. 916, 71 S.Ct. 735, 95 L.Ed. 1351 (1951). See pp. —— —— of 187 U.S.App.D.C., pp. 995–996 of 570 F.2d supra.

structions to the jury, and in admitting, or failing to admit, at least two important pieces of evidence, the judgment must be reversed and the case remanded for another trial. On remand, we strongly suggest that the trial judge use his discretion to submit the case to the jury on special interrogatories,[87] rather than elicit a mere general verdict. Antitrust cases present difficult problems for jurors; written interrogatories would help them to focus on the salient issues, and would help to pinpoint what went wrong should this case, *horribile dictu*, come to this Court a third time.

*So ordered.*