Albert NEUMANN, et al., Plaintiffs,

v.

The REINFORCED EARTH COMPANY, Defendant.

Civ. A. No. 81–0459.

United States District Court, District of Columbia.

July 5, 1984.

James N. Hanny, Michelle A. Parfitt, Robert A. Taylor, Jr., Washington, D.C., for plaintiffs.

Richard McMillan, Jr., Washington, D.C., for defendant.

## MEMORANDUM

GASCH, District Judge.

The plaintiffs brought this antitrust case to challenge the filing of a lawsuit by the defendant in the United States District Court for the District of Maryland and a patent protest lodged by the defendant in the United States Patent Office. The plaintiffs are Albert Neumann, inventor of the Tension Retaining Earth System ("TRES") and Mr. Neumann's companies. The defendant is The Reinforced Earth Company

("RECO"), a company that markets in the United States an earth retaining system developed by the French inventor, Henri Vidal.

For some time prior to the events immediately preceding this lawsuit, Mr. Neumann worked for RECO, and in that capacity had access to confidential drawings and trade secrets of RECO. After Mr. Neumann resigned from his employment, RECO learned that he was attempting to market a wall that RECO's executives considered to be suspiciously similar to a wall that RECO had designed and with which Mr. Neumann was familiar. After an investigation of Mr. Neumann's wall, RECO brought an action against Neumann in the United States District Court for the District of Maryland, alleging that Neumann had stolen trade secrets from RECO. The parties to that lawsuit agreed that the question of whether Mr. Neumann's invention was patentable over other designs would be submitted to the Patent Office for resolution. The Maryland lawsuit and Patent Office protest are the basis of the plaintiff's complaint alleging abuse of process and antitrust violations in the form of sham litigation and an attempt to monopolize or actual monopolization.

Trial in this matter lasted from March 7, 1984 through March 26, 1984. The jury rendered a verdict in favor of RECO on the counts of monopolization and common law abuse of process. On the Special Verdict Form submitted by the Court to the jury, the jury found that the Maryland lawsuit did not constitute sham litigation and also found that the definition of the relevant market was retaining walls, rather than the definitions proffered by the plaintiff, i.e., walls over 20 feet in height or in the alternative, federal and state highway walls on which RECO had bid. The jury did, however, find that the patent protest or request for reconsideration by RECO was a sham, that RECO had attempted to monopolize, that there was a dangerous probability that RECO would achieve monopoly power, that plaintiffs had the intention and preparedness to compete in the relevant market necessary to establish standing,

and that the defendant's attempt to monopolize resulted in $1 million damage to the plaintiffs.

The defendant has now moved for judgment notwithstanding the verdict or in the alternative, for a new trial. They offer four grounds for their motion. The defendant asserts that there is no evidence to support a finding that the patent protest was sham. The defendant also states that a finding of attempted monopolization was impossible by definition because the defendant's market share was too low to support such a finding. On the question of standing, the defendant asserts that the plaintiffs have made no progress in marketing the patented TRES, have offered no evidence of their preparedness to market TRES regardless of the patent protest, and have failed to put into the record any evidence tending to show that the patent protest caused the difficulties experienced in marketing TRES. Finally, the defendant asserts that there is no competent evidence in the record of plaintiffs' damages.

The legal standard by which the Court must evaluate this motion is set forth in the case of *Vander Zee v. Karabatsos,* 589 F.2d 723 (D.C.Cir.1978), *cert. denied,* 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1066 (1979). The Court may grant JNOV only if "the evidence, together with all inferences that can reasonably be drawn therefrom, is so one-sided that reasonable men could not disagree on the verdict." *Id.* at 726. The verdict may not, however, stand if the plaintiff has not produced any evidence upon which a jury can properly proceed to reach a verdict for the plaintiff. See *Gunning v. Cooley,* 281 U.S. 90, 94, 50 S.Ct. 231, 233, 74 L.Ed. 720 (1930); *Murray v. Towers,* 239 F.2d 914, 915 (D.C.Cir.1956). *The Patent Protest*

The First Amendment protects the right to petition government agencies without fear of retribution. The *Noerr-Pennington* doctrine ensures that courts extend First Amendment Protection to efforts to petition that might otherwise be subject to attack under the antitrust laws.

The sham exception to the *Noerr-Pennington* doctrine excludes from First Amendment immunity litigation or other petitioning activity that is frivolous, baseless, or otherwise improper. See *California Transport v. Trucking Unlimited*, 404 U.S. 508, 510–16, 92 S.Ct. 609, 611–14, 30 L.Ed.2d 642 (1972); *United Mine Workers of America v. Pennington*, 381 U.S. 657, 669–70, 85 S.Ct. 1585, 1592–93, 14 L.Ed.2d 626 (1965); *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 139–40, 81 S.Ct. 523, 530–31, 5 L.Ed.2d 464 (1961). The sham exception to antitrust immunity established in the *Noerr-Pennington-Trucking Unlimited* line of cases does not extend to genuine attempts to secure governmental action, even though the motive may be anticompetitive. Thus, the burden is on the plaintiff in this case to show that RECO's purpose in bringing the patent protest and request for reconsideration in the Patent Office was not to obtain a decision on the patentability of Neumann's invention, but that, on the contrary, it was to achieve some purpose outside the patent process, and was itself so baseless or frivolous as to pervert the protest procedure itself. *Federal Prescription Service, Inc. v. American Pharmaceutical Association*, 663 F.2d 253, 262–63 (D.C.Cir.1981), *cert. denied*, 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982).

The sham exception to the *Noerr-Pennington* doctrine as it applies to litigation before agencies and courts, was set forth by the Supreme Court in *California Transport v. Trucking Unlimited*, 404 U.S. 508, 511–16, 92 S.Ct. 609, 612–14, 30 L.Ed.2d 642 (1972). It was further explained by the Court of Appeals for the District of Columbia Circuit in *Federal Prescription Services v. American Pharmaceutical Association*, 663 F.2d 253, 262–65 (D.C.Cir.1981), *cert. denied*, 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982). This latter suit was brought by a mail order prescription company against American Pharmaceutical Association and alleged coconspirators arising from American's nationwide efforts to eliminate mail order prescription services as competitors. The trial court found that American had violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring with the Iowa Board of Pharmacy Examiners to harm the plaintiff in its business. The Court of Appeals reversed, holding that the facts of the case reflected no actionable conspiracy under the antitrust laws. The Court of Appeals reviewed the trial court's application of the *Noerr-Pennington* doctrine and the sham exception thereto. 663 F.2d at 261–68. The Court rejected the contention that " 'the difference between protected activity and sham action depends on the competitive or anticompetitive purpose of exercising the right of petition and [that] evidence of such a purpose is a pattern of actions designed to accomplish the destruction of a competitor.' " *Id.* at 262 (quoting appellee's brief at 31). The Court stated that in addition to anticompetitive intent and "a pattern of actions" the sham exception can only apply where there is proof that the defendant has subverted the integrity of the governmental processes, that the defendant effectively barred the plaintiff's access to these processes, *see also California Transport v. Trucking Unlimited*, 404 U.S. at 515, 92 S.Ct. at 614, or that the nature of these processes made invocation something other than the "political activity" that was recognized by the *Noerr-Pennington-Trucking Unlimited* line of cases. *Id.* 663 F.2d at 261–68. The Court cited as examples of cases in which the integrity of the government process was subverted, cases involving overtly corrupt conduct, such as bribes and misrepresentations in the adjudicatory process.[1] The Court of Appeals also indicated that where the earlier suit has an outcome favorable to the plaintiff in that suit, that successful outcome is evidence of the genuineness of the plaintiff's efforts to secure governmental action through that

---

**1.** Misrepresentations in the legislative process, unlike those in the judicial process, had been found not to amount to subversion of the government process. *California Transport v. Trucking Unlimited*, 404 U.S. at 513, 92 S.Ct. at 613.

suit. *Federal Prescription Services*, 663 F.2d at 265.

■ With these guidelines in mind, the Court turns to the record of the trial in this action in search of evidence of sham litigation. There is no evidence in the record that the plaintiff in the patent protest, The Reinforced Earth Company, in any way subverted the integrity of the Patent Office process by corrupt conduct, such as bribes or misrepresentation. Nor is there any suggestion in the record that RECO barred Mr. Neumann's access to the Patent Office processes. Nevertheless, if RECO's purpose in the Patent Office was in fact, *not* to secure governmental action, but to harm the plaintiff by abusing the relevant government process, then the sham exception may apply. *Id.* at 263. Whether Mr. Neumann in this case has met his burden thus turns on whether he has put in evidence that the Patent Office protest was baseless. See *id.*

At the outset, it should be noted that the protest began by agreement of the parties and had originated as an issue in the Maryland suit,[2] which the parties agreed to remove to the Patent Office. The record shows that Mr. Rosenberg, Mr. Neumann's patent attorney, discussed the transfer of patent-related issues from the Maryland Court to the Patent Office with Mr. Neumann. Mr. Rosenberg's testimony shows that Mr. Neumann preferred the Patent Office adjudication of the patent issues because that adjudication would be less expensive than a determination by the Maryland Court. In order for RECO to file the patent protest, Mr. Neumann or his attorney had first to withdraw the patent from issue.[3] Mr. Rosenberg filed such a petition to withdraw the patent from issue and Judge Miller, presiding judge in the Maryland litigation, was notified of this agreed-upon change in the case by a letter from the parties.

The plaintiff has submitted no evidence that would show that The Reinforced Earth Company knew the claim was without merit or acted regardless of the merits of the claim. On the contrary, Assistant Commissioner Tegtmeyer's opinion stated that "it is apparent from a review of the application file that questions are present as to the patentability of the claim as well as to the conduct by, or on behalf of, the applicant." Assistant Commissioner Tegtmeyer granted RECO's request for reconsideration and remanded eight separate issues to the primary examiner for further review. Moreover, the final decision of Assistant Commissioner Tegtmeyer expressly found that Mr. Rosenberg had been negligent in failing to inform the examiner and the Patent Office about relevant prior art and that he had mischaracterized such prior art once it was discovered. In Mr. Neumann's response to the request for reconsideration, Mr. Neumann's lawyer did suggest that "the addition of this Prior Arts Statement is merely an attempt by the Protestor to delay prosecution in the subject Patent Application, and to delay the issuance of the U.S. Patent directed to the inventive concept of the applicant." The opinion of the plaintiff's own patent attorney as expressed in his response to the request for reconsideration, in the face of numerous pieces of evidence strongly supporting the fact that real issues existed, could not convince a reasonable juror that there were no issues.

Finally, there is the presumption of genuineness created by the petitioner's success in the course of the petitioning activity. See *Federal Prescription Services*, 663 F.2d at 265. The file history of Mr. Neumann's patent indicates that Patent Office officials agreed that genuine issues were in dispute in the protest proceeding. On some of these issues RECO prevailed. The request for reconsideration, for example,

---

**2.** The Maryland suit itself was found not to be sham by the jury in this case.

**3.** Informal notice of allowance had already been mailed to Neumann on November 2, 1977. Once the notice of allowance has been given and the issue fee paid, the patent issues automatically unless it is withdrawn from issue by the petitioner or the Patent and Trademark Office or its issuance is deferred at the applicant's request. 37 C.F.R. § 1.314.

was granted. The final decision of the Assistant Commissioner, moreover, found, in accordance with the allegations in RECO's protest, that Mr. Neumann's patent attorney had been negligent in failing to inform the patent examiner and the Patent Office about certain relevant prior art and that he had mischaracterized such prior art once it was discovered. In another opinion, the Assistant Commissioner stated that a review of the application file indicated that questions were present as to patentability. Likewise, in granting The Reinforced Earth Company's request for reconsideration, the Assistant Commissioner found, as RECO had argued, that the examiner should have considered the Don Orione Madonna Wall, the design of which was similar to plaintiff's test wall for which the patent was sought. There was no evidence before the jury on which the jury could make a finding of baselessness. The standards for finding a petitioning activity to have been sham, as enunciated in *Federal Prescription Services*, have not been met here—under any understanding of the evidence adduced at trial. Accordingly, the defendant's motion for JNOV is granted on this ground.

*Sufficiency of RECO's Market Share to Support a Finding of Attempted Monopoly*

■ The defendant attacks the verdict on the ground that the market share established for RECO by the undisputed evidence at trial is so small that as a matter of law it precludes a finding of attempted monopolization. For the plaintiffs to establish an attempt to monopolize in violation of Section 2 of the Sherman Act, they must show that the attempt posed a dangerous probability that a monopoly would be established. *Swift & Company v. United States*, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905). This requirement in turn necessitates a showing that the defendant have sufficient market power to make it likely that it can achieve the mo-

nopoly allegedly attempted. *See* 3 VonKalinowski, Antitrust Laws and Trade Regulation § 9.01[2] (rev. perm. ed. 1983). It is generally recognized by the courts that market shares below 30%, absent extraordinary circumstances, cannot support a finding of attempt to monopolize. See *Yoder Brothers, Inc. v. California Florida Plant Corporation*, 537 F.2d 1347, 1369 (5th Cir. 1976), *cert. denied*, 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977); *Hiland Dairy, Inc. v. Kroger Company*, 402 F.2d 968, 974 (8th Cir.1968), *cert. denied*, 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969); *cf. United States v. Aluminum Company of America*, 148 F.2d 416, 431 (2d Cir.1945).

Although the plaintiffs put into evidence lengthy expert testimony on the issue of the relevant market, the jury elected the defendant's definition, that is, "retaining walls." The relevant market argued for by the plaintiffs was retaining walls over 20 feet in height or highway retaining wall projects for which RECO was listed as a source. The jury's answer on the Special Verdict Form made it clear that the jury rejected both of the plaintiffs' definitions.

■ The only evidence of the size of the relevant market composed of all retaining walls was testimony put in at the trial by David McKittrick, who is the president of RECO, and Jerry DiMaggio, an official of the Federal Highway Administration called as a witness by plaintiff. These witnesses testified that the size of the market for all retaining walls was in excess of $500 million or several million.[4] During the period when the patent protest was pending, 1978–81, RECO's gross sales ranged from $9 million to $22.4 million. As a percentage of the total market size of $500 million, RECO's sales ranged from 1.8 percent of the total market in 1978 to 4.5 percent of the total market in 1981. As discussed previously, a defendant in an antitrust lawsuit with a market share that is uncontrovertedly below 5 percent of the relevant

4. Although the plaintiffs argue that the witnesses were testifying in the present tense and put into evidence no testimony on the size of the market in the years in question, the transcript suggests otherwise. Moreover, the testimony of these two witnesses is the only evidence on the question of market size.

market cannot, as a matter of law, be found to have attempted monopolization. In its charge to the jury the Court instructed that if the jury found a market share below 20 percent, the jury should find no attempted monopolization and the verdict should be in favor of the defendant on this claim. The jury appears to have disregarded this instruction. The Court is now constrained to hold as a matter of law that RECO did not attempt to monopolize in violation of Section 2 of the Sherman Act.

### The Plaintiffs' Standing to Sue Under Section 4 of the Clayton Act, 15 U.S.C. § 15

Section 4 of the Clayton Act gives standing to sue to any person who is injured in his business or property by reason of anything forbidden in the antitrust laws. The two-fold standing requirement established by this section was discussed in the case of *Hecht v. Pro-Football, Inc.*, 570 F.2d 982 (D.C.Cir.1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978): the plaintiff must show not only an injury in fact to his business or property, but also a causal connection between that injury and the defendant's allegedly illegal act. *Id.* at 987. As the Court in *Hecht* noted, it is generally not required that a plaintiff actually be engaged in a going business in order to have antitrust standing. He need only manifest an intention to enter the business and demonstrate his preparedness to do so. It is thus necessary to ascertain whether the trial record contains any evidence tending to show Mr. Neumann's preparedness to establish a business based on the patented TRES and whether there is any evidence to support the conclusion that the delay in issuance of the patent that resulted from the patent protest proximately caused some measurable injury to that business interest.

The *Hecht* Court in drawing the line between promotion and preparedness noted that "the courts have drawn the line at the point where promotion transcends the level of hopes, desires, and expectations, and reaches a certain stage of maturity and concreteness, a stage where it is accompanied by certain indicia of ultimate success." *Id.* at 994. Mere intention to enter a field thus is not enough. The *Hecht* Court went on to state that "[i]ndicia of preparedness include adequate background and experience in the new field, sufficient financial capability to enter it, and the taking of actual and substantial affirmative steps toward entry, 'such as the consummation of relevant contracts and procurement of necessary facilities and equipment.'" *Id.* (quoting *Denver Petroleum Co. v. Shell Oil Co.*, 306 F.Supp. 289, 308 (D.Colo. 1969)). Moreover, the Court went on to state, the negotiation of contracts does not constitute the necessary business. The contracts must be consummated.

When the case at hand is viewed in the light of the *Hecht* criteria, the Court finds no evidence from which a reasonable juror could find that the plaintiff had the necessary business preparedness to establish standing or that the plaintiff's business failures resulted from the patent protest. All of Neumann's attempts to secure financing from banks and other lending institutions were made and rejected prior to defendant's filing the patent protest. Thus, it is only the potential support from Dur-O-Wall and the Schnabel Foundation Company that the plaintiffs may turn to in an effort to establish preparedness. The testimony of Mr. Welsh of the Dur-O-Wall Company showed that negotiations between Dur-O-Wall and Mr. Neumann terminated after Neumann built his demonstration wall in November 1976. Mr. Welsh stated in his testimony that his reason for breaking off negotiations with Mr. Neumann was the pendency of the Maryland case. The pendency of the patent protest was not asserted as a reason for terminating the negotiations.

Negotiations with the Schnabel Foundation Company were not commenced until after the patent protest was filed. The reason given for termination of those negotiations was that the Schnabel Foundation Company had better investment opportunities with other products. There was no

testimony to the effect that it was the patent protest that influenced the Schnabel Foundation Company to turn to other investment opportunities.

The *Hecht* case requirement of affirmative steps toward entering the market has not been met here. The evidence indicates that the plaintiffs consummated no contract for the sale of the TRES wall at any time prior to, during or after the patent protest. The plaintiffs thus could offer no evidence to show the financial backing and affirmative steps toward entry that are necessary to establish standing.

Similarly, on the question of causation, the plaintiffs' evidence fails. The plaintiffs' efforts to market Mr. Neumann's wall have been devoted to the unpatented designs, rather than the patented TRES design. Thus, any delays in marketing the unpatented design cannot have resulted from delays in receiving a patent on a design that was never actually marketed even after the patent was issued. Under the criteria outlined in *Hecht v. Pro-Football, Inc.*, the plaintiffs in this case lack standing.

*Competency of the Damages Evidence*

The defendant has moved to exclude the testimony of Dr. David Schwartzman, plaintiff's expert economist, on the $3 million and $19 million estimates of damage to the plaintiffs. The Court admitted this expert testimony over the repeated objections of counsel for the defendant, and the defendant has now renewed its request for a ruling that Dr. Schwartzman's testimony was wholly speculative and that the jury had no competent evidence on which to base a damage calculation.

Dr. Schwartzman's testimony was based on sales projections prepared by Albert Neumann in 1979 when he was trying to enlist the support of the Schnabel Foundation Company in marketing his TRES wall. These projections, according to the testimony of Mr. Neumann, were "a possibility, an aim, completely abstract figure" and "speculation" and a "guess." According to the testimony of Dr. Schwartzman, Dr. Schwartzman did not make any effort to evaluate the reasonableness of the expenses projected by Mr. Neumann.

It was from this basis that Dr. Schwartzman derived his two damage calculations of $3 million and $19 million. Dr. Schwartzman expressed the opinion that the actual damages were closer to the $19 million figure than to the $3 million figure but was unable to state where between the $3 and $19 million figures the actual damages fell. In his deposition as to both damage estimates and at trial as to the $19 million damage estimate, Dr. Schwartzman admitted that he had made no attempt to evaluate competitive response to Albert Neumann's entry into the market.

Dr. Schwartzman's preference for the $19 million damage figure was premised on an assumption that Mr. Neumann would achieve sales of $214,000 per month in April 1977. The testimony of Albert Neumann himself, however, indicated that two months prior to April 1977 no contracts were expected to be entered into by April of 1977. Likewise, the $3 million damages projection anticipated expenses in the first year totaling $38,000, and the evidence indicated that the only possible money available to cover any portion of those expenses was a $30,000 loan sought from C.E.D.A., which loan would have been predicated on Mr. Neumann's obtaining an approval letter for his wall from the Maryland Department of Transportation, a letter Mr. Neumann stated he never sought.

The wall on which the Neumann projections were based was the Richardson wall. Dr. Schwartzman stated that his estimate was based on a patented product. The Richardson wall is not the patented TRES and did not exist in 1977 or 1978, the first two years of the Schwartzman estimates.

Moreover, as noted above, the jury at the trial on this matter found that the Maryland litigation was not a violation of the antitrust laws. Yet underlying the damage estimates submitted by Dr. Schwartzman was the assumption that both the Maryland suit and the patent protest were causes of the damage. No effort was made to differ-

entiate between damage caused by the patent protest and damage caused by the Maryland litigation in the damage estimate offered by this expert.

In antitrust cases it is admittedly difficult to establish damages with mathematical precision, *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123–24, 89 S.Ct. 1562, 1576–77, 23 L.Ed.2d 129 (1969). Nevertheless, the plaintiffs in an antitrust suit must submit for the jury's consideration damage estimates that are based on more than "mere speculation or guesswork." *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946); *Smith v. Pro-Football, Inc.,* 593 F.2d 1173, 1189 (D.C. Cir.1978). At the trial in this matter the Court repeatedly asked counsel for the plaintiff to submit for the jury's consideration damage estimates based on a foundation grounded in real world market conditions and the plaintiffs' own actual situation and relationship to that market. Only in this manner could the expert arrive at an estimate that would avoid the taint of speculativeness that appeared to afflict the expert testimony on this matter. This the plaintiff failed to do.[5] The Court therefore rules the expert testimony on damages to be incompetent and finds that there is absent from the record of the trial in this matter any competent evidence upon which a damage calculation could be based.

## CONCLUSION

The Court has reviewed the record in this case and the memoranda submitted by the parties in support of and in opposition to the motion for JNOV. The record of the evidence adduced at trial leads to the inescapable conclusion that reasonable minds could not differ. The patent protest clearly was not sham, and no attempt to monopolize occurred. Moreover, the evidence does not permit a finding that the plaintiffs had the necessary business preparedness to en-

ter the retaining wall market or that the patent protest resulted in any injury to the plaintiffs. There is furthermore no competent evidence in this record from which the jury could arrive at a damage figure. Accordingly, the defendant's motion for JNOV must be granted.

5. Demonstrative of the kind of speculativeness that characterized these damage estimates was the expert's decision simply to take figures projected for one four year period and move them back to the four year period for which

projections were here required—without raising any question about or compensating for how the retaining wall market and other factors might have differed for the two periods.