**AMERICAN TELEPHONE &
TELEGRAPH COMPANY,**
Plaintiff,

v.

**NORTH AMERICAN INDUSTRIES OF
NEW YORK, INC., Defendant and
Third–Party Plaintiff,**

v.

**NEW YORK TELEPHONE COMPANY,**
Third–Party Defendant.

**No. 90 Civ. 5198 (MBM).**

United States District Court,
S.D. New York.

Aug. 22, 1991.

Eric H. Moss, Great Neck, N.Y., for defendant and third-party plaintiff.

John M. Clarke, Sandra Di Iorio, Colvin W. Grannum, New York City, for third-party defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

This is a motion to dismiss the third-party complaint by third-party defendant New York Telephone ("NYTel") for failure to state a claim under the antitrust laws. For the reasons set forth below, NYTel's motion is granted as to NAI's claim for common law unfair competition and is otherwise denied.

### I.

Plaintiff American Telephone and Telegraph Company ("AT & T") has sued defendant/third-party plaintiff North American Industries ("NAI") seeking payment for certain long distance calls placed from NAI's pay telephones. NAI contends that those calls were fraudulently placed by NAI customers and that it should not be required to pay for them. Rather, third-party defendant NYTel should pay for them because its refusal to provide to NAI pay telephones certain central office interconnection services that are provided to NYTel pay telephones makes it possible for telephone service thieves to place fraudulently billed telephone calls from NAI-owned pay telephones. NAI alleges that NYTel's refusal to provide these services violates § 2 of the Sherman Act.

NAI is a reseller of telecommunications services through public pay telephones. To receive a dial tone and connection with the networks of long distance carriers such as AT & T, pay telephones must be connected to local exchange companies ("LECs"). NYTel, the LEC in southern New York, has a lawful monopoly on the provision of dial tones and interconnection services.

NAI contends that NYTel has violated the antitrust laws by not allowing NYTel's competitors in the pay telephone market to have access to the services and facilities within NYTel's central office that are available to NYTel pay telephones. NYTel's failure to provide similar services results in increased costs of operation to its competitors, including NAI. According to NAI, NYTel's refusal to provide these services is part of an attempt to regain the monopoly

on public pay telephone services it lost when the industry was deregulated in 1985.

According to the third-party complaint, NYTel pay telephones are connected to "coin service" lines. Coin service lines lead to central office equipment which is programmed to block completion of calls made from NYTel's pay telephones unless the central office equipment detects that the NYTel pay telephone has received proper payment or billing instructions, either through the deposit of coins or the giving of a valid calling card or third party billing number. NYTel's competitors in the public pay telephone market are provided access only to NYTEL's "business lines." Those lines are essentially the same as the service lines that are installed at any business location, and do not provide access to the central office facility that blocks calls until payment or proper billing instructions are received. NYTel's competitors are therefore forced to purchase "smart telephones." Such telephones are designed to detect and block fraudulently billed calls.

NAI contends that smart telephones are inadequate substitutes for access to coin service lines because they do not prevent "clip on" or secondary dial tone fraud. "Clip on" fraud occurs when a telephone service thief "clips on" to a NYTel-provided NAI service line, thereby eluding the protections that have been built into smart telephones. According to NAI, NYTel's installers invariably leave service lines exposed, and therefore subject to clip on fraud. Potential telephone service thieves splice into the telephone lines between the smart telephone and the central office, connect their own telephones, and make direct calls which are then billed to NAI in the absence of alternative billing instructions.

Secondary dial tone fraud occurs as follows: because the dial tone provided by NYTel permits unrestricted access to local and long distance telephone networks, NAI's smart telephones are programmed to provide customers with a false dial tone until the phone has detected receipt of proper payment for the call. After proper payment or billing instructions are received, the smart telephone allows the call-

er access to NYTel's dial tone and, therefore, other telephone networks. Smart telephones are also programmed to detect when a call has ended so that it can sever immediately connection to the central office's unrestricted dial tone. The telephone severs the connection when it senses the momentary drop in line voltage (a "wink") that occurs when the called party's central office equipment returns a dial tone to that party's telephone. According to NAI, NYTel has altered its "wink" to a signal that smart telephones are not programmed to recognize, without informing NAI or other NYTel competitors, for the purpose of foiling its competitors' smart telephones. Telephone service thieves can therefore dial local calls from NAI's telephones, wait for the called party to hang up and then "grab" the unrestricted dial tone generated by NYTel's central office, thereby gaining unrestricted access to the long distance telecommunications network. Those calls are billed to NAI. Both types of telephone service fraud allegedly would be prevented if NAI had access to the central office facilities that NYTel pay telephones use.

NAI also contends that different central office facilities and services provided NYTel's competitors, including NAI, prevent AT & T's long distance or international operators from obtaining information necessary to reject attempts to bill operator assisted, collect and third party billed calls to NAI's pay telephone lines. NYTel provides to its own pay telephones a service which automatically alerts long distance and international operators that a call is being placed from or billed to one of its own pay telephones. Those operators therefore know that they must detect coin deposits or otherwise receive valid billing information before completing the call to or from that pay telephone station. The third-party complaint alleges that despite NAI's repeated demand for and payments to NYTel for this particular call screening service ("Code 88"), NYTel has failed and refused to program its database so that long distance and international operators can identify NAI public access lines as pay telephones. Long distance and international operators therefore do not block calls

placed to or from NAI pay telephones when no billing information is provided. NAI is then billed for those calls.

Callers from NYTel pay telephones cannot complete international calls. Those calls are blocked automatically by the central office equipment to which coin access lines are connected. The third-party complaint alleges that despite NAI's demands and payments for this service, NYTel has failed and refused to provide international call blocking. NAI is therefore subject to substantial direct dial international call fraud.

Third-party defendant NYTel moves to dismiss for failure to state a claim.

## II.

Third party plaintiff NAI advances three different theories for finding NYTel liable under the antitrust laws. It alleges that NYTel wields unlawful monopoly power over the pay telephone market in the New York City metropolitan region, that NYTel is attempting to monopolize the pay telephone market in the New York City metropolitan region, and that NYTel has control over an essential facility which it unreasonably denies to NAI for the purpose of monopolizing the pay telephone market. Based on the facts alleged in NAI's third-party complaint, and accepting those facts as true, as I must, I find that NAI has stated a claim for a violation of § 2 of the Sherman Act.

### A. *Monopoly Power*

To state a claim for unlawful monopoly under § 2 of the Sherman Act, NAI must allege that NYTel possesses monopoly power in the relevant market and that it willfully acquired or maintained that power in a manner that was not the result of a superior product, business acumen, or historical accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). Monopoly power means the power either to control prices or to exclude competitors from the relevant market. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed.

1264 (1956). NAI cannot show that NYTel possesses the power to control prices, because pay telephone rates are regulated by the New York Public Service Commission ("NYPSC"), therefore NAI must show that NYTel possesses the power to exclude competition.

NAI alleges that NYTel possesses monopoly power in the pay telephone service market in the New York City Metropolitan area. Its complaint alleges that as of October 29, 1990, NYTel controlled approximately 85% of the pay telephones in that geographic area and that NYTEL's pay telephones generated approximately 75% of the revenues generated by all pay telephones in the area.

NYTel argues that the relevant market is improperly defined as pay telephones provided by NYTel and other "small, privately-owned pay telephone operators" in New York City and Nassau, Suffolk and Westchester counties. NAI therefore overstates NYTel's market share by excluding from the product market pay telephones owned by large, publicly owned pay telephone providers. NAI responds that the product market is "the provision of pay telephone services to the public," (Complaint at ¶ 8) and therefore not artificially narrow. NYTel has also alleged no facts to suggest that AT & T and other large companies have any pay telephones installed in the geographic market and therefore that NAI's market share statistics are inaccurate or overstated.

NYTel argues that NAI's geographic market is arbitrarily based on political divisions rather than on an analysis of competition. The appropriate geographic market is that geographic area within which pay telephone customers affected by the challenged practices can practicably turn to other providers for pay telephone service in the event that NYTel exercises monopoly power. *United States v. Philadelphia Nat. Bank*, 374 U.S. 321, 359, 83 S.Ct. 1715, 1739, 10 L.Ed.2d 915 (1963); *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974). Those persons affected by the alleged practice challenged here are those

who have installed on their premises pay telephones which connect to the local exchange service provided by NYTel. Because NYTel's lawful monopoly over the local exchange services is defined by political subdivisions, it is not unreasonable at this stage for NAI to have used those political subdivisions to define the relevant geographic market. This is the only geographic area within which NAI and NYTel compete for purposes of the practices complained of in this action. *Marine Bancorporation, supra; Federal Trade Commission v. Proctor & Gamble*, 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967).

 NYTel argues that these allegations concerning market share are conclusory and inadequate. Although market share statistics do not prove monopoly power, particularly in the context of a formerly regulated industry, in the absence of evidence to the contrary, a predominate share of the market can be reason to infer the existence of monopoly power. *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) (market share of 87% "leaves no doubt that ... these defendants have monopoly power"); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980) (Kodak controlled over 61% of the amateur conventional still camera market); *Delaware & H.R. Co. v. Conrail*, 902 F.2d 174, 179 (2d Cir.1990) ("While market share is not the sole factor in the determination of market power, it is a highly significant one"); *but see Metro Mobile CTS, Inc. v. Newvector Communications, Inc.*, 892 F.2d 62 (9th Cir.1989); *Southern Pacific Communications Co. v. American Tel. & Tel. Co.*, 740 F.2d 980 (D.C.Cir.1984), *cert. denied*, 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985).

NYTel argues that because NAI concedes that small private pay telephone operators have been able to enter the market since deregulation in 1985, it cannot show that NYTel has monopoly power, or in this case, the power to exclude competitors regardless of its dominant market share. If there are low barriers to entry, then an entity with a dominant market share is less likely to be able to exert monopoly power. *Metro Mobile CTS*, 892 F.2d at 63. NYTel argues that NAI has conceded that NYTel has lost market power since deregulation,[1] and that the fact that its share of the market, though still enormous, has declined since 1985 proves that it does not have monopoly power. Although a decline in market share may be some evidence that NYTel lacks monopoly power, *United States v. American Telephone and Telegraph Co.*, 552 F.Supp. 131, 171 (D.D.C.1982), in this case, in which NAI alleges that NYTel is erecting significant barriers to entry in the pay telephone market by forcing its competitors to absorb significant losses from preventable telephone service theft, decline in market share after deregulation is not sufficient proof as a matter of law that NYTel is not a monopolist within the pay telephone market.

The liberal pleading rules which govern actions in federal court require that I deny NYTel's motion to dismiss unless I find that NAI cannot prove a set of facts showing that NYTel has the power to exclude competition. NAI alleges that NYTel pay telephones account for 85% of the pay telephones in the relevant geographic market. At this time it is at least possible that NAI will show that NYTel's denial of access to its coin access lines, its alteration of the "wink" (see p. 781, *supra* ), plus its refusal to provide Code 88 service and international call blocking, create significant barriers to entry for new competitors by imposing high costs of operation that NYTel need not pay. *See Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919 (9th Cir. 1980), *cert. denied*, 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981). At least one of these NYTel practices is alleged to have been newly imposed—the alteration of the "wink"—and therefore the fact that there were entrants into the market in the past may not fully reflect current barriers to entry.

---

1. The third-party complaint states that as of 1983—that is, prior to deregulation of pay telephone services—NYTel controlled 100% of the pay telephones in the same geographic area.

■ NYTel also argues that NAI cannot show NYTel's market power was unlawfully gained or maintained. Until 1985, it was not lawful for entities other than NYTel to own and operate pay telephones in New York. Its acquisition of monopoly power was not in violation of the Sherman Act. NYTel misunderstands NAI's complaint. According to NAI, NYTel is unlawfully either maintaining or else attempting to recapture the lawful monopoly that it held prior to deregulation. Although several competitors entered the market after deregulation, it is NAI's contention that NYTel is now trying to prevent them from remaining. Accordingly, NAI has alleged sufficient facts to state a claim for unlawful monopolization in violation of § 2 of the Sherman Act.

## B. *Attempted Monopolization*

■ To state a claim for attempted monopolization, NAI must allege that NYTel: (1) intended to monopolize the pay telephone market in the relevant geographic market; (2) engaged in conduct designed to carry out that intent; and (3) had a "dangerous probability of success." *Twin Laboratories Inc. v. Weider Health & Fitness*, 900 F.2d 566 at 570. (2d Cir.1990). NAI has alleged enough to state a claim that NYTel has attempted to monopolize the pay telephone market in the New York Metropolitan area, including that with control of 85% of market share, its refusal to provide service to competitors and alteration of the "wink," and resulting significant losses to its smaller competitors because of their inability to protect against all types of telephone service theft, there is a dangerous probability that NYTel will succeed in recapturing its former monopoly. *H.L. Hayden Co. v. Siemens Medical Systems, Inc.*, 879 F.2d 1005, 1017 (2d Cir. 1989) ("A dangerous probability of success may exist where the defendant possesses a significant market share when it undertakes the challenged anticompetitive conduct").

## C. *NAI's Essential Facilities Claim*

NAI alleges that NYTel has utilized its monopoly power as the sole authorized LEC to monopolize and/or attempt to monopolize the pay telephone market in the New York City metropolitan area. According to NAI, in order to increase the costs of operation and losses from theft of telephone services that are incurred by NYTel's competitors, NYTel fails and refuses to provide to its competitors the same services and facilities that it provides to itself in connection with its own pay telephones. NYTel's alleged purpose is to drive its competitors in the pay telephone market out of business, thereby allowing NYTel once again to monopolize the pay telephone business in the New York City metropolitan area.

■ NYTel argues that NAI has failed to state a claim for attempted monopolization under the essential facilities doctrine. The antitrust laws prohibit a monopolist from unreasonably and discriminatorily restricting its competitors' access to essential facilities. *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). *Otter Tail*, which also involved a regulated industry, stands for the principle that "a monopolist may not abuse its monopoly power in one market to gain an improper advantage or to destroy threatened competition in an adjacent market in which it also operates." *Official Airline Guides, Inc. v. F.T.C.*, 630 F.2d 920, 925 (2d Cir.1980), *cert. denied*, 450 U.S. 917, 101 S.Ct. 1362, 67 L.Ed.2d 343 (1981). To prevail under § 2 of the Sherman Act under this theory, NAI must prove that: (1) NYTel, a monopolist, has control of an essential facility; (2) its competitors are unable practically or reasonably to duplicate the facility; (3) NYTel denied its competitors use of the facility; and (4) NYTel could provide access to its competitors without impairing its ability "to render adequate service to its customers." *Otter Tail*, 410 U.S. at 381, 93 S.Ct. at 1031.

There is no dispute that NYTel has control over the central office facilities and services to which NAI seeks access. There is similarly no dispute that NYTel has a lawful, regulated monopoly over the provi-

sion of the particular services and facilities to which NAI seeks access. In addition, NYTel does not deny that is does not provide its pay telephone competitors access to the coin access lines that it provides for its own pay telephones.

NYTel argues that NAI has not alleged that the central office services it seeks are "essential" within the meaning of the antitrust laws. According to NYTel, mere access to a local exchange telephone service is sufficient to satisfy the antitrust laws; additional services are not essential. NYTel indisputably provides local exchange telephone service to NAI.

 The federal antitrust laws do not require NYTel to provide NAI with exactly the same services and facilities it provides to its own pay telephones. *See Hecht v. Pro–Football, Inc.,* 570 F.2d 982 (D.C.Cir. 1977), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978); *see also United States v. Terminal Railroad Asso.,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912) (access to essential facilities must be afforded competitors "upon such just and reasonable terms and regulations as will, in respect of use, character and cost of service, place every such company upon as nearly an equal plane as may be with respect to expenses and charges as that occupied by the proprietary companies"); *see also United States v. American Tel. & Tel. Co.,* 524 F.Supp. 1336 (D.D.C.1981). For NAI to show that the central office facilities and services to which it seeks access are essential, it need not show that they are indispensable. *Hecht,* 570 F.2d at 992. However, NAI must demonstrate, at the very least, "that 'duplication of the facility would be economically infeasible' and that 'denial of its use inflicts a *severe handicap* on potential [or current] market entrants.'" *Twin Laboratories,* 900 F.2d at 568 (citing *Hecht, supra*) (emphasis added in *Twin Laboratories*). It must show more than inconvenience or some economic loss. *Twin Laboratories,* 900 F.2d at 570.

 Although NYTel argues that, at least to a limited extent, its competitors can duplicate those services through the use of smart telephones, NAI responds that the economic loss to NYTel's competitors caused by NYTel's failure to provide the same facilities and services to its competitors that it provides itself [2], in spite of their use of smart telephones, is debilitating to small companies seeking to compete with NYTel, and creates a significant barrier to entry. NYTel retains the ability to frustrate the protections built into its competitors' "smart telephones," as illustrated by its alteration of the "wink," thereby rendering the smart telephones useless as a means of avoiding certain types of telephone fraud.

For purposes of this motion to dismiss, NAI has adequately alleged that the central office services refused it by NYTEL are essential within the meaning of the federal antitrust laws. *See MCI Communications Corp. v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1150–52 (7th Cir.1983).

To be sure, " '[i]t has always been the prerogative of a manufacturer to decide with whom it will deal.' " *Official Airline Guides, Inc.,* 630 F.2d at 927 (citing *Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126, 133 (2d Cir.) (*en banc*), *cert. denied,* 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978)). "We think that even a monopolist, as long as he has no purpose to restrain competition or to enhance or expand his monopoly, and does not act coercively, retains this right." *Id.* at 927–28; *see Southern Pacific Communications, supra; see Hecht, supra* ("[t]he antitrust laws do not require that an essential facility be shared if such sharing would be impractical or would inhibit the defendant's ability to serve its customers adequately"); *see also United States v. American Tel. & Tel. Co., supra* ("problems of feasibility and practicability may be taken into account by the Court in determining the sufficiency under the law of the access to essential facilities granted by defendants to non-Bell carriers").

However, NYTel has provided no evidence on this motion that it cannot provide these services to NAI, other than a refer-

---

**2.** Which in NAI's case has totalled more than $1 million.

ence to a 1990 opinion by the NYPSC ("NYPSC Opinion 90–12"), which states *inter alia* that there would have been technological difficulties in providing access to coin access service lines if a non-NYTel pay telephone provider chose to charge rates for its calls that differ from NYTel's. NAI contends that it should have the option to choose whether to provide the same rates in order to gain access to the same central office equipment. Indeed, it alleges that it does in fact adhere to the same rate schedule as NYTel.

NAI has alleged that NYTel, which is in direct competition with NAI and other pay telephone providers, has acted with the intent to destroy the nascent competition they provide. These allegations, combined with its allegations regarding NYTel's market power, are sufficient to state a claim for a § 2 violation based on denial of essential facilities.

## D. *Injury*

■ The antitrust laws were enacted "for the protection of *competition,* not *competitors." Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) (emphasis in original). NYTel argues that NAI has not alleged an injury cognizable under the antitrust laws in that NAI has alleged injury to itself as a competitor, but not injury to competition as a result of NYTel's alleged actions. Although NAI may have a higher cost of operation, and may be in some financial trouble as a result of having to pay over $1 million to AT & T because of telephone service theft that allegedly could have been prevented, the facts in the third-party complaint indicate that numerous small competitors have entered the pay telephone market in the New York Metropolitan area, and that those competitors control a greater proportion of pay telephone revenue per phone than NYTel. NAI has stated no facts which support its conclusory allegation that NYTel's actions have allowed it to increase its market share.

NAI argues that the fact that AT & T is seeking over $1 million in this action for unauthorized call charges accrued on NAI's lines makes it obvious that small, independent pay telephone service providers who must rely upon NYTel for local exchange service cannot survive the losses caused by NYTel's practices. At this point in the litigation, it is sufficient that NAI has set forth facts from which it is reasonable to infer both that NYTel's other competitors presently in the market also suffer undue costs as a result of NYTel's allegedly anticompetitive behavior and that potential competitors may be dissuaded from entering the market because of NYTel's predatory practices.

## E. *Causation*

■ NYTel has various theories why NAI cannot show that NYTel caused the injuries it allegedly suffered. First, NYTel argues that NAI's claim must fail because the direct cause of NAI's alleged injury was the acts of NAI's customers who placed fraudulently billed calls, not NYTel. A damage theory that places the liability for these calls on NYTel is too speculative and attenuated—there is no evidence that access to NYTel's coin access lines would have prevented these calls. *Jones v. Ford Motor Co.,* 599 F.2d 394, 397 (10th Cir. 1979) (a right of action under the antitrust laws "is limited to those directly injured by the anti-competitive behavior"). NAI responds that the same individuals who steal NAI pay telephone service also attempt to steal NYTel pay telephone service. They do not succeed with NYTel pay telephones because of the services NYTel provides itself but not its competitors. Therefore, according to NAI, NYTel is the direct cause of NAI's injuries for purposes of the antitrust laws. I agree.

■ Second, NYTel argues that because NAI alleges that AT & T prevented NYTel from curtailing the fraudulent use of NAI's pay telephones and it should be estopped to argue that NYTel is at fault. NAI does not address this argument in its papers, but it is plainly without merit. Even if it were true that NAI's theories of relief are in some ways inconsistent, a party may maintain inconsistent alternative

theories without invoking judicial estoppel. *Friedman v. National Presto Industries, Inc.,* 566 F.Supp. 762 (E.D.N.Y.1983).

Finally, NYTel argues that NAI has ignored the intervening acts of NYPSC, which has put into effect a tariff which sets forth the specific terms upon which NAI and other pay telephone providers are interconnected with NYTel. The NYPSC's approval of NYTel's tariffs breaks any connection between NYTel's actions and NAI's injury. This latter argument is interrelated with the state action defense discussed below, but for purposes of NYTel's causation argument, it suffices to say that the terms described in the tariff are not imposed on NYTel by the NYPSC. NYTel drafts the proposed tariff, and then forwards it to the NYPSC for approval. NYPSC approval of NYTel controlled tariffs hardly operates to relieve NYTel of antitrust liability in the absence of a valid state action defense.

### III.

NYTel contends that even if NAI has stated a claim under the federal antitrust laws, NYTel's actions are exempted from federal antitrust scrutiny under the state action doctrine. I disagree.

The Supreme Court has set forth a two-pronged test for determining whether state regulation of private parties such as New York Telephone shields their actions from application of the federal antitrust law. First, the challenged restraint must be "one clearly articulated and affirmatively expressed as state policy." Second, the State must actively supervise the private anticompetitive conduct. *Southern Motor Carriers Rate Conference, Inc. v. United States,* 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985). In order to take advantage of the state action defense, a private party charged with having acted anticompetitively need not prove that it was compelled by the state in so acting, but rather need show only that the state policy expressly permits the anticompetitive conduct charged. *Id.* at 60, 105 S.Ct. at 1728. "As long as the state as sovereign clearly intends to displace competition in a particular field with a regulatory structure, the first prong ... is satisfied." *Id.* at 64, 105 S.Ct. at 1730.

NYTel is regulated by the New York Public Service Commission ("NYPSC") pursuant to the New York Public Service Laws, but the mere fact of regulation does not guarantee that NYTel has a state action defense. "[P]ublic utility regulation typically assumes that the private firm is a natural monopoly and that public controls are necessary to protect the consumer from exploitation. There is no logical inconsistency between requiring such a firm to meet regulatory criteria insofar as it is exercising its natural monopoly powers and also to comply with antitrust standards to the extent that it engages in business activity in competitive areas of the economy." *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 595–96, 96 S.Ct. 3110, 3120, 49 L.Ed.2d 1141 (1976). *See Capital Telephone Co. v. New York Tel. Co.,* 750 F.2d 1154 (2d Cir.1984), *cert. denied,* 471 U.S. 1101, 105 S.Ct. 2325, 85 L.Ed.2d 843 (1985).

Section 90(3) of the chapter of the N.Y. Public Service Law which sets forth the statutes regulating telephone and telegraph service provided as of 1985 that: "3. (1) Except as otherwise provided in this subdivision, a reseller of telephone service by means of a protective circuitry device or a customer owned or leased currency operated telephone (COCOT), where such device or telephone is registered with the federal communications commission, shall be exempt from the requirements of this chapter." N.Y.Pub.Serv.Law § 90(3) (McKinney's 1989). The legislative findings accompanying this 1985 deregulation of COCOTs are as follows:

"The legislature hereby finds and declares that the federal communications commission has permitted registration of customer owned currency operated telephones (COCOTS) and that the public service commission has authorized the resale of telephone service by means of such telephones on the privately owned premises of residences and business establishments. It is recognized that COCOTs offer the public an alternative

788

to other types of coin operated telephones and that COCOT providers will be in competition with the telephone utilities and with each other.

The legislature further finds that since competition exists between COCOT resellers and since most telephone consumers can continue to rely on coin telephone service provided by a regulated telephone corporation, comprehensive utility type regulation does not appear necessary for COCOT services. However, the legislature further finds that the commission should establish minimum requirements to protect COCOT consumers from unacceptable conditions of service.

Accordingly, it is the legislature's intention by these amendments (a) to exempt resellers of telephone service by means of COCOTs from regulation as telephone utilities under the public service law and (b) to authorize the public service commission to establish such minimum service, rate and location requirements as may be necessary to regulate COCOTs in the public interest."

Section 1 of L.1985, c. 461, eff. July 19, 1985, cited in N.Y.Pub.Serv.Law § 90, Historical Note (McKinney's 1989).[3]

It is clear from 1989 and 1990 Public Service Commission opinions that the NYPSC considered it within its jurisdiction to regulate the services in dispute. During that period the NYPSC addressed concerns of COCOT operators that NYTel denied them access to various services it utilizes to prevent telephone fraud on its own pay telephones. Those opinions reflect a desire to maintain competition between non-LEC and LEC pay telephone providers, while at the same time ensuring that minimum service requirements are met in the event of market failure to the detriment of consumers. *See* NYPSC Opinion 90–12 at p. 5 ("it is desirable to place LEC payphones and COCOTs on an equal footing, to the extent practicable, in the interest of fair and effective competition"), pp. 14–17 ("LEC payphones should not have the advantage of services and technical features denied to COCOTs. As a general principle of equity and fair competition this is unexceptionable, and will be enforced, with LECs expected to comply by filing the appropriate tariff additions"), pp. 38–41 ("all telephone utilities and IXCs operating in New York will be directed to develop and offer methods by which COCOTs may minimize the burden of implementing the non-blocking requirement. These should include 10XXX + 1 call blocking by the LECs, transmission of a COCOT identification (class-of-service mark) code to the IXC on any 10XXX + 1 call, and blocking by the IXC of any 10XXX call resulting in a charge to the COCOT unless it has specific agreements for completion of such calls. In particular, NYT will be directed to coordinate the network technology features, and to report its plans for deploying these features within 30 days of this Order's effective date"); *see also* NYPSC Opinion 90–25 at pp. 4–8, 21–22; NYPSC Opinion 89–12 at pp. 24–27, 32–33.

Nothing in the proceedings before the NYPSC suggests that the New York legislature sought to restrain competition through its regulation of COCOTs. Indeed, the statute clearly articulates a desire to foster competition, and to regulate only where market failure occurs. The statutory structure provides that NYPSC has authority to regulate only minimum service. The New York legislature has expressed a clear intent to displace unfettered competition only to the extent that minimum services and protections are not provided to pay telephone customers. Where competition is thriving and minimum or better services are provided, COCOTs are unregulated. Because the

---

**3.** The statute has recently been revised to state, *inter alia:*

3. (1) Except as otherwise provided in this subdivision or section ninety-two-c of this article, a reseller of telephone service by means of a customer owned or leased currency operated telephone (COCOT) shall be exempt from the requirements of this chapter.

(2) The commission shall have power to establish by rule or regulation minimum service, rate, interconnection and location requirements for COCOTs upon a determination that such requirements are in the public interest.

(McKinney's Supp.1991) I do not find the changes relevant to the state action analysis.

NYPSC is authorized only to regulate minimum service requirements, it appears that New York has no policy to replace unfettered competition with regulation, but rather that New York does not regulate the provision of services in excess of the minimum. Accordingly, to the extent that the services in issue are not already required by the NYPSC, NYTel's conduct in withholding them is subject to the federal antitrust laws.

### IV.

■ NYTel moves to dismiss NAI's state law claims for lack of federal subject matter jurisdiction and failure to state a claim. NAI alleges that NYTel wrongfully forced it to pay NYTel directly and "as agent and for the account of AT & T" monies for the allegedly fraudulent calls made by NAI's customers, and that therefore NYTel is liable for money had and received. The elements of a claim for money had and received are: (1) defendant received money belonging to plaintiff, (2) defendant benefited from the receipt of the money, and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money. *Nordlicht v. New York Telephone Co.*, 799 F.2d 859, 865 (2d Cir.1986), *cert. denied*, 479 U.S. 1055, 107 S.Ct. 929, 93 L.Ed.2d 981 (1987). NAI alleges that NYTel, knowing that NAI had no just responsibility for the sums claimed, coerced it into paying by threatening to cut off local exchange service to NAI's pay telephones.[4]

NYTel asserts that NAI has failed to state a claim for money had and received because: (1) no claim will lie against a defendant where it acted merely as a collecting agent for another party, *Unger v. Travel Arrangements Inc.*, 25 A.D.2d 40, 46, 266 N.Y.S.2d 715 (1st Dept 1966), and (2) NYTel charged NAI for the calls and collected the money at a time when tariffs filed with the NYPSC required the billings to be made. No cause of action can be stated where a tariff required the billings. *Nordlicht*, 799 F.2d at 866.

■ NAI argues that when a utility uses a tariff to the disadvantage of its competitors, then the "filed tariff" doctrine is inapplicable. *Mishawaka v. Indiana & Michigan Electric Co.*, 560 F.2d 1314 (7th Cir.1977), *cert. denied*, 436 U.S. 922, 98 S.Ct. 2274, 56 L.Ed.2d 765 (1978); *see Groton v. Connecticut Light & Power Co.*, 662 F.2d 921, 929 (2d Cir.1981). In light of NAI's allegations, the filed tariff doctrine should not operate as a defense in this case. The doctrine is intended to protect utilities which charge filed rates for lawfully provided service. It is not intended to protect utilities which use those tariffs to aid anticompetitive behavior. *Groton v. Connecticut Light & Power Co.*, *supra*. The tariffs permit NYTel to threaten to cut off service in order to ensure that its bills are paid. Although normal bill disputes may involve such a small amount that there is little incentive for the telephone company to litigate the dispute in order to receive payment, this dispute involves millions of dollars. Therefore, paying the bill prior to resolution of the dispute has greater adverse consequences to NAI than ordinary fee dispute cases, and there is less reason to expect that if the telephone company is not paid in the first instance, it will not receive payment. More importantly, NAI alleges that NYTel seeks to destroy its competitors by forcing them to bear unreasonably high operation costs. Application of the tariff in this instance only enhances NYTel's ability to succeed in its alleged anticompetitive conduct.

■ NYTel argues that NAI cannot maintain an action for money had and received because the complaint alleges that NYTel has already given the money to AT & T. *Unger v. Travel Arrangements, Inc.*, *supra*, cited by NYTel, does not stand for the proposition that in any case where the defendant has already turned over the

---

**4.** Although this claim seems largely duplicative of NAI's antitrust claim, in that NAI has no obligation to pay these charges because the fraud could have been avoided but for NYTel's monopolistic behavior, NAI's Answer holds out the possibility that there is in addition some contract defense to these claims: if the calls are not "valid," then NAI has no obligation under its agreement with AT & T to pay for them.

money to its principal, an action for money had and received will not lie. It stands rather for the principle that equity bars such an action *only* when the agent *innocently* turns over the money to its principal—that is, without knowledge that the money is not properly due. *Id.*, 25 A.D.2d at 46, 266 N.Y.S.2d at 720. " 'A person who has paid money to another in the performance of an agreement with a third person is entitled to restitution from the other ... unless the other gave value therefor or changed his position, with notice of the cause of avoidance.' " *Id.*, 25 A.D.2d at 44–45, 266 N.Y.S.2d at 720 (quoting from the Restatement of Law of Restitution § 17). NAI has alleged that NYTel was aware that these sums were not lawfully owed AT & T at the time they were allegedly transferred. Accordingly, no principle of equity requires that the action against NYTel for money had and received be dismissed.

NAI also alleges that NYTel is liable for common law unfair competition for discriminating against it in the provision of facilities and services. To state a claim for common law unfair competition, NAI's claim must be grounded in either deception or misappropriation of its exclusive property. *H.L. Hayden Co.*, 879 F.2d at 1025. NAI has not alleged any such facts. Accordingly, its claim for common law unfair competition must be dismissed.

\* \* \* \* \* \*

For the reasons discussed above, third-party defendant NYTel's motion to dismiss the third-party complaint is granted as to the unfair competition claim, but is otherwise denied.

SO ORDERED.